ROCKINGHAM SQUARE SHOPPING CENTER, INC., AND LEE D. TUTTLE v.
INTEGON LIFE INSURANCE CORPORATION AND THE NORTH-
WESTERN BANK

No. 8017SC1155

(Filed 7 July 1981)

1. **Rules of Civil Procedure § 56.4— affidavit opposing summary judgment—when filed**

   Affidavits in opposition to a motion for summary judgment should be served prior to the day of the hearing on the motion, and while G.S. 1A-1, Rule 6(b) and (d) give the trial court discretion to allow the late filing of affidavits, the court does not abuse its discretion when it refuses to accept late affidavits absent a showing of excusable neglect.

2. **Accord and Satisfaction § 1— summary judgment based on accord and satisfaction**

   In an action for breach of contract, negligence, fraud, abuse of process, joint venture and unfair trade practices allegedly growing out of the financial failure of a shopping center for which defendant bank provided the construction loan, summary judgment was properly entered for defendant on the basis of the affirmative defense of accord and satisfaction where the evidence showed that, after the corporate plaintiff filed a petition for reorganization under the Bankruptcy Act, the parties agreed that the corporation would be sold to a third party; as a part of the sale, defendant bank agreed to forgive more than $40,000 in interest and other fees to which it was entitled, to relieve the individual plaintiff and his brothers of their individual liability as guarantors, and to consolidate and refinance the remaining liability of the individual plaintiff and his brothers with certain business property as security; the corporation's trustee told the bankruptcy judge that the parties had agreed on a basis for resolving all of the various relationships between the bank, the corporation, and the individual stockholders as guarantors which would follow from the sale and employ the proceeds of the sale; the bankruptcy proceedings were dismissed by an order finding that the stockholders and the bank had agreed upon a settlement of all obligations and other matters and things in dispute among them; and sale of the corporation to the third party was subsequently completed. Furthermore, summary judgment was properly entered for defendant bank since it appeared that plaintiffs' claims were utterly baseless in fact.

APPEAL by plaintiffs from *DeRamus, Judge.* Judgment entered 27 May 1980 in Superior Court, ROCKINGHAM County. Heard in the Court of Appeals 26 May 1981.

This action concerns the development of Rockingham Square Shopping Center in Madison, North Carolina. Lee Tuttle conceived the idea of building the shopping center in 1971. He and his two brothers, Carl Tuttle and Robert Garth Tuttle, purchased a tract of land in September 1971, borrowing the purchase price of $40,000 from The Northwestern Bank. They incorporated as Rockingham Square Shopping Center, Inc., in 1972. Although each

brother owned one-third of the corporate stock, only Lee Tuttle was active in development of the shopping center. His two brothers acted as "silent partners." Rockingham Square obtained a construction loan of $852,000 from The Northwestern Bank. The Tuttle brothers and their wives personally guaranteed repayment of the loan. Integon Life Insurance Corporation issued a permanent loan commitment in the same amount. Development of the shopping center was hampered by numerous problems. Northwestern advanced almost $250,000 beyond the amount of the original construction loan before the shopping center was completed. Integon refused to close its permanent loan commitment on grounds that the shopping center was not completed by the specified deadline. It gave a second permanent loan commitment, but it refused to close that for the reason that Rockingham Square and the Tuttles were not solvent. Northwestern instituted foreclosure proceedings and Rockingham Square filed for reorganization in federal district court. Eventually, the shopping center was sold to Cos-Wat Dairy Distributors, Inc. for one million dollars, and the bankruptcy proceedings were dismissed. The sale price did not cover all of the Tuttles' liability to Northwestern. Lee Tuttle's brothers sold their corporate stock to him, and he and Rockingham Square instituted the present action against Northwestern and Integon.

By their complaint, plaintiffs sought to hold Northwestern and Integon responsible for the financial failure of the shopping center venture. Plaintiffs alleged claims for breach of contract, negligence, fraud, abuse of process, joint venture, and unfair trade practices. Integon moved to dismiss the action against it for failure to state a claim, and this motion was allowed. Northwestern filed answer, denying the material allegations of the complaint and asserting various defenses, including an accord and satisfaction between the parties in connection with the dismissal of Rockingham Square's bankruptcy proceedings. Further, Northwestern counterclaimed against plaintiffs for indebtedness which it had agreed to cancel as part of the alleged accord and satisfaction.

Discovery was conducted, and Northwestern moved for summary judgment on the basis of interrogatories and depositions. Plaintiffs offered affidavits in opposition at the summary judgment hearing, but the affidavits were rejected as untimely. The

materials before the trial court on summary judgment tended to show the following:

Lee Tuttle was inexperienced in developing shopping centers, but he tried to educate himself by reading. After he and his brothers purchased the land for the shopping center, he began seeking potential lenders and tenants. He approached the Town of Madison in February 1972 about opening and paving a road, Lonesome Road, to improve access to the shopping center area, and the Board of Aldermen voted to open the road. He began getting cost estimates from various building contractors, including Alvis Hole. He had prospective tenants send their requirements to Hole so that he could prepare his estimates. Hole first estimated construction at $7 to $8 per square foot, but he later gave an estimate closer to $12 per square foot. Hole put Tuttle in touch with T. C. Farthing, an engineer who prepared blueprints for the shopping center. Tuttle and Farthing met in September 1972 and agreed that Tuttle would supply specifications and that Farthing would prepare the plans and get them approved.

Tuttle applied to Northwestern for a construction loan in October or November 1972. He testified by deposition that he could not recall what stage the construction loan was in when it was definitely decided that he would hire Alvis Hole as general contractor. At one point he asserted that if he had known Northwestern "was going to require me to have a contractor even under unfavorable conditions, I would have never entered the project." However, at another point, he testified that it was "pretty conclusive" that Hole would be building the shopping center from the time that Farthing became involved. Tuttle also testified that although Northwestern had told him that he would have to have a general contractor, he wanted to supervise construction himself, and he continued to try to talk Northwestern out of the general contractor requirement. Hole testified, "Lee told me that I was his contractor and that he wanted me to build the stores, and that was considerably before we got the blueprints." Hole got blueprints and submitted estimates for A & P and Sears stores on 3 March 1973. He stated that he anticipated building the shopping center at that time. Robert Cardwell, Jr., the manager of Northwestern's branch in Madison, testified that he told Tuttle around the first of 1973 that he would be required to have a general contractor. It was standard bank policy to require a general contrac-

tor on a project of this sort to ensure that the buildings were properly constructed, and Northwestern discouraged Tuttle's desire to build the shopping center himself.

Tuttle obtained a permanent loan commitment from Integon on 19 January 1973 for a 20-year loan of $852,000 at 9 percent interest. This commitment required completion of the shopping center by 19 June 1974. The commitment further provided: "We are to be furnished with complete plans and specifications signed both by contractor and owners"; and "We are to be furnished with a copy of the final construction contract." A construction loan of $852,000 was approved by Northwestern's loan committee and board of directors. Before approval, Northwestern made certain advances to Tuttle: $40,000 for purchase of the land and about $60,000 to $70,000 for grading work. The construction loan was closed on 30 April 1973. The construction loan agreement called for compliance with every provision and condition of the permanent loan commitment of Integon. The parties also entered into a buy-sell agreement on 30 April 1973 providing for Integon to purchase Northwestern's note and mortgage upon compliance with the conditions of the permanent loan commitment.

Rockingham Square entered into a contract with Alvis Hole on 19 June 1973 for the construction of Sears, Scotties Drug, Family Dollar, and A & P stores. Hole was to be paid 12 percent of the costs, plus a $15,000 fee, plus 50 percent of the savings under $11 per square foot. Hole began construction in late July or early August of 1973.

Construction of the shopping center was hampered by numerous problems. There were cost overruns, material shortages, and construction delays. The Town of Madison never opened Lonesome Road. Friction developed among Tuttle, Hole, and Northwestern. It soon became apparent that the shopping center would not be completed by the deadline of 19 June 1974. On 13 December 1973, Integon agreed to extend its commitment for sixty days. On that same date, Tuttle fired Hole when A & P threatened to cancel its lease if work on its building was not done more quickly. Tuttle stated that he got a Northwestern official to approve the firing in advance, but that "some people from Northwestern" subsequently told him to rehire Hole or face foreclosure. Northwestern officials stated that they were concerned about the

considerable delay and difficulty involved in finding a general contractor to take over a half-completed project. Hole asserted that his dismissal would have resulted in the departure of the subcontractors and a three-month delay in construction.

Rockingham Square entered into another contract with Hole on 8 Jaunary 1974. This contract called for Hole to be paid 10 percent of the costs, with the exception of labor costs, for which he was to receive 18 percent up to $2,500 and 13 percent thereafter. Tuttle claimed that this contract was more favorable to Hole because Hole was then angry with him and could inflate the costs. Hole asserted that the new contract was more favorable to Rockingham Square. The new contract did not include the building for a new tenant, TG&Y, and Tuttle undertook construction of this building himself.

On 17 April 1974, the Town of Madison temporarily stopped construction on this building when Farthing complained that Tuttle was using incomplete and unapproved blueprints, threatening the safety of the building.

In June and July of 1974, two other setbacks occurred. On 17 June, Integon reduced its commitment to $786,000 based upon revisions in the projected rent roll for the shopping center. On 10 July, Rockingham Square and the Tuttles had to borrow an additional $175,000 from Northwestern on a demand note at 12 percent interest in order to complete construction.

Throughout construction, Tuttle accused Northwestern of interfering and undermining his authority in disputes with Hole. In one dispute, Tuttle accused Hole of billing him on an electrical subcontract for work that had not been done. Bank officials agreed with Hole that the bill should be paid. In another dispute, a ceiling collapsed and the ceiling subcontractor and electrical subcontractor blamed each other. Tuttle asserted that Northwestern and Hole wanted to pay both and that he was able to persuade them to resolve liability first "only after a lot of pressure." A third dispute involved the unavailability of insulation for the roof of A & P. Tuttle found another type of insulation and got A & P's approval; however, Hole and Northwestern questioned the substitution. They made Tuttle call A & P to confirm the approval, which Tuttle considered to be "very degrading" to him.

Tuttle claimed that the shopping center was completed by the new deadline of 19 August 1974 except for the spreading of gravel on the roof of TG&Y building. Integon took the position that its deadline had not been met, and it refused to go through with its permanent loan. Tuttle wanted to sue Integon; Northwestern encouraged Tuttle to find other permanent financing. Integon offered a new permanent loan commitment on 5 September 1974, in the amount of $773,424, for a term of nineteen years at 10 percent interest. This commitment required closing by 4 September 1975 and further provided for Rockingham Square and its guarantors to be fully solvent at the time of closing. Plaintiffs alleged in their complaint that Northwestern induced them to accept this second permanent loan commitment by promising to help them meet the solvency requirement. Still more money was needed to complete the shopping center. On 13 September 1974, Rockingham Square and the Tuttles executed a $250,000 demand note at 9 percent interest in favor of Northwestern. This note paid off the previous demand note. Northwestern eventually advanced about $242,000 pursuant to this new note. The shopping center was completed and all tenants moved in by the first of 1975.

In June 1975, Integon requested an audit by a certified public accountant to show the solvency of Rockingham Square and its guarantors. Tuttle and his accountant, Herbert Harrington, met with James Hartley, vice-president of Northwestern's credit department, in an effort to get Northwestern to agree in writing as to how it would handle the debt in excess of Integon's permanent commitment. It then appeared that Rockingham Square would have a net cash flow of only $2,074 per year after Integon's debt payments and the shopping center's operating expenses. Northwestern would not agree to any long-term financing. Northwestern suggested that Tuttle sell the undeveloped portion of the shopping center tract in order to meet the solvency requirement, but Tuttle did not want to do so. No solution was reached. Northwestern did write a letter to Integon on 8 August 1975 including the following: "We are most willing to work with Mr. Tuttle in order to resolve any cash flow problems which our other loan transactions may cause. However, we will be unable to take any affirmative action until the Rockingham Square loan has been closed with Integon." Integon took the position that the solvency requirement had not been met, and it refused to close. Both In-

tegon and Tuttle claimed the $17,000 standby fee which had been deposited to Integon's account as part of its loan commitment. Integon agreed to give up one-half of the fee in return for a full release, and such a release was executed in September 1975. Tuttle claimed that Northwestern pressured him into accepting this arrangement.

Northwestern demanded payment on 5 September 1975, but it agreed to give Tuttle time to seek other financing or a buyer for the shopping center. Neither was forthcoming, and on 1 December 1975, Northwestern again demanded payment of the debt, which was then greater than $1,009,000. It instituted foreclosure proceedings, and sale of the shopping center was ordered by the Rockingham Clerk of Superior Court on 5 January 1976. Rockingham Square appealed. Shortly thereafter, an offer to purchase the shopping center arose, and Tuttle and bank officials met on 30 January 1976. The meeting resulted in agreement to delay foreclosure for ninety-one days in return for assignment of rents to Northwestern, dismissal of Rockingham Square's appeal of the foreclosure order, and disbursement of Rockingham Square's appeal bond to Northwestern. This purchase offer did not go through. Foreclosure sale was set for 17 May 1976, but Rockingham Square filed a petition for reorganization under the Bankruptcy Act on 13 May 1976.

The first creditors' meeting was held before Bankruptcy Judge Rufus W. Reynolds on 22 July 1976. The meeting was continued until 23 September 1976 in order for the parties to try to work out a solution. Meanwhile, A & P announced it was withdrawing from the shopping center. Tuttle estimated that the shopping center was worth only $300,000 or $400,000 without a major grocery store tenant. Several offers to purchase the shopping center were unsuccessfully pursued. Eventually, Byrd's Food Centers expressed an interest in taking over the A & P Store, and Cos-Wat Dairy Distributors, Inc., owner of the Byrd's chain, made an offer to purchase the entire shopping center tract for one million dollars. During this time, dissension arose between the Tuttle brothers, and Carl and Robert Tuttle employed their own attorney. Tuttle blames Northwestern's attorney for creating the dissension. The three brothers met as stockholders of Rockingham Square on 13 and 16 September 1976. Carl and Robert Tuttle voted to accept the offer of Cos-Wat. Lee Tuttle was pur-

suing a better deal with another party and was opposed to this sale, but he was outvoted. A contract of sale with Cos-Wat was signed on 16 September 1976. As part of the sale, Northwestern agreed to waive certain amounts due it, to restructure the Tuttles' remaining liability, with certain business property as collateral, and to release the Tuttles from personal liability.

The parties met before Bankruptcy Judge Reynolds on 23 September 1976 and requested approval of their agreement. The trustee's attorney asserted that the parties had agreed "on a basis for resolving all of the various relationships between the bank, the corporation, and the individual stockholders as guarantors which would follow from the sale and employ the proceeds of the sale." Judge Reynolds approved the sale. On 24 September 1976, he dismissed the bankruptcy proceedings, finding in part that "the stockholders and the Bank have agreed upon a settlement of all obligations and other matters and things in dispute among them." The sale to Cos-Wat was closed on 8 October 1976.

Based upon the above materials, the trial court entered summary judgment for Northwestern. Plaintiffs appeal.

*Edwards, Greeson, Weeks & Turner, by Joseph E. Turner, for plaintiff appellants.*

*Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by William F. Maready and Jackson N. Steele, for defendant appellee, The Northwestern Bank.*

MARTIN, (Harry C.), Judge.

[1] At the final pretrial conference on 9 January 1980, defendant's motion for summary judgment was scheduled for hearing at the 5 May 1980 term of Rockingham Superior Court. The parties subsequently agreed for the hearing to be held on 8 May 1980 at 9:30 a.m. Defendant relied upon the pleadings and discovery of record. At commencement of the hearing, plaintiffs delivered to defense counsel and offered to the court the affidavit of Lee Tuttle. Later that day, plaintiffs produced additional affidavits in opposition to summary judgment. Defendant objected to all of these affidavits, and the trial court sustained the objection. On the second day of the summary judgment hearing, plaintiffs moved pursuant to N.C.G.S. 1A-1, Rule 60(b)(6), for relief

---

---

from the sustention of defendant's objection. This motion was denied, and plaintiffs now assign error to these two rulings. We find no error in them.

Plaintiffs argue that N.C.G.S. 1A-1, Rule 56, does not require that affidavits in opposition to summary judgment be filed in advance of the hearing and, alternatively, that Rule 6(d) gives the trial court discretion to allow late filing of opposing affidavits. Rule 56(c), in pertinent part, provides: "The adverse party prior to the day of hearing may serve opposing affidavits." *Insurance Co. v. Chantos*, 21 N.C. App. 129, 203 S.E. 2d 421 (1974), dealt with the question of when affidavits in support of a motion for summary judgment must be filed and served. In the course of deciding that issue, this Court quoted the above provision of Rule 56(c) and wrote: "It is clear that opposing affidavits are to be served prior to the day of the hearing." *Id.* at 130, 203 S.E. 2d at 423. This statement is in accord with authorities under the comparable federal rule. *See Jones v. Menard*, 559 F.2d 1282 (5th Cir. 1977); *Beaufort Concrete Co. v. Atlantic States Construction Co.*, 352 F.2d 460 (5th Cir. 1965); *cert. denied*, 384 U.S. 1004, 16 L.Ed. 2d 1018 (1966); 10 Wright and Miller, Federal Practice and Procedure § 2719 (1973). We now reaffirm that affidavits in opposition to a motion for summary judgment should be served prior to the day of the hearing. It is true that Rule 6(b) and (d) gives the trial court discretion to allow the late filing of affidavits. However, both *Chantos* and federal cases hold to the effect that absent a showing of excusable neglect, the trial court does not abuse its discretion when it refuses to accept late affidavits. *Chantos, supra; Farina v. Mission Inv. Trust*, 615 F.2d 1068 (5th Cir. 1980); *Beaufort Concrete Co., supra.*

In the present case the plaintiffs had notice of the summary judgment hearing nearly four months in advance. The discovery relied upon by defendant was of record. Plaintiffs offered no explanation for their delay in presenting opposing affidavits, and we find no error in the trial court's exclusion of them. Plaintiffs' Rule 60(b)(6) motion for relief from sustention of the objection to their affidavits was, of course, inappropriate, as that rule expressly applies only to final judgments. *Sink v. Easter*, 288 N.C. 183, 217 S.E. 2d 532 (1975). Regardless of the rule cited, we find no abuse of discretion in the trial court's refusal to reconsider its ruling. In any event, plaintiffs were not prejudiced. Lee Tuttle's deposition

was already before the court. We have reviewed the affidavits tendered by the plaintiffs, and we find that they add nothing of legal significance to the materials which were considered at the summary judgment hearing.

The principles applicable to summary judgment are well established. The moving party has the burden of clearly establishing the lack of any triable issue of fact. The papers supporting the movant's position are to be closely scrutinized while those of the opposing party are to be regarded indulgently. The motion may only be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See e.g., Yount v. Lowe*, 288 N.C. 90, 215 S.E. 2d 563 (1975); *Zimmerman v. Hogg & Allen*, 286 N.C. 24, 209 S.E. 2d 795 (1974); *Singleton v. Stewart*, 280 N.C. 460, 186 S.E. 2d 400 (1972). "Two types of cases are involved: (a) Those where a claim or defense is utterly baseless in fact, and (b) those where only a question of law on the indisputable facts is in controversy and it can be appropriately decided without full exposure of trial." *Kessing v. Mortgage Corp.*, 278 N.C. 523, 533, 180 S.E. 2d 823, 829 (1971). We find summary judgment appropriate in the present case.

[2] Summary judgment was properly entered on the basis of Northwestern's affirmative defense of accord and satisfaction. *Dobias v. White*, 239 N.C. 409, 80 S.E. 2d 23 (1954), explains accord and satisfaction as follows:

> An accord and satisfaction is compounded of the two elements enumerated in the term. "An 'accord' is an agreement whereby one of the parties undertakes to give or perform, and the other to accept, in satisfaction of a claim, liquidated or in dispute, and arising either from contract or tort, something other than or different from what he is, or considers himself, entitled to; and a 'satisfaction' is the execution or performance, of such agreement." 1 C.J.S., Accord and Satisfaction, section 1.

*Id.* at 413, 80 S.E. 2d at 27.

> Defendants' plea of accord and satisfaction "is recognized as a method of discharging a contract, or settling a cause of action arising either from a contract or a tort, by substituting

for such contract or cause of action an agreement for the satisfaction thereof, and an execution of such substitute agreement." . . .

The word "agreement" implies the parties are of one mind — all have a common understanding of the rights and obligations of the others — there has been a meeting of the minds. . . . Agreements are reached by an offer by one party and an acceptance by the other. This is true even though the legal effect of the acceptance may not be understood.

*Prentzas v. Prentzas*, 260 N.C. 101, 103-04, 131 S.E. 2d 678, 680-81 (1963) (citations omitted).

In *Construction Co. v. Coan*, 30 N.C. App. 731, 228 S.E. 2d 497, *disc. rev. denied*, 291 N.C. 323 (1976), the plaintiff constructed a motel for the defendants. There was a delay in completion of the project, and construction cost more than the guaranteed maximum set forth in the contract. After completion, the plaintiff and the defendants met in September 1973 to discuss their problems. The defendants agreed to pay the plaintiff a certain amount by certified check and to execute two notes to the plaintiff in return for the plaintiff's execution of an affidavit acknowledging payment in full and waiving any lien rights in the project. This agreement was carried out, but defendants failed to pay the notes and the plaintiff filed suit. The defendants answered and counterclaimed for breach of the construction contract. The plaintiff raised the affirmative defense of accord and satisfaction in its reply. The plaintiff moved for summary judgment on the basis of its president's affidavit regarding the September 1973 meeting. The defendants produced an affidavit stating that no resolution of the contract dispute or complete resolution had occurred. The plaintiff was allowed summary judgment. On appeal this Court wrote:

Normally, the existence of an accord and satisfaction is a question of fact for the jury. But where the only reasonable inference is existence or non-existence, accord and satisfaction is a question of law and may be adjudicated by summary judgment when the essential facts are made clear of record. 1 Am. Jur. 2d, Accord and Satisfaction, § 53, p. 352.

*Id.* at 737, 228 S.E. 2d at 501. The Court noted that the amount due the plaintiff was in dispute, that the defendants agreed to ex-

ecute the notes, that the plaintiff's affidavit clearly established that the notes were given in full satisfaction of the disputed debt, and that at no time between execution of the notes and their counterclaim some year and a half later did the defendants deny their obligation on the notes by reason of plaintiff's breach of contract. The Court held that the only possible inference to be drawn from the affidavits was that an accord and satisfaction had been reached at the September 1973 meeting and that defendants' affidavit amounted to a mere general denial, which was insufficient to put the existence of an accord and satisfaction in issue. Summary judgment was affirmed; the cause was remanded for determination of the interest due on the notes.

In the present case the evidence tends to show that the shopping center was facing financial collapse in September 1976 when Cos-Wat offered to buy it for one million dollars. Northwestern offered certain concessions as part of such a sale. Northwestern agreed to forgive more than $40,000 in interest and other fees to which it was entitled, to relieve the Tuttles of their individual liability as guarantors, and to consolidate and refinance the Tuttles' remaining liability, with certain business property as security. The three Tuttle brothers met as stockholders and voted two to one to accept the offer. Lee Tuttle opposed the sale. His deposition reveals that his objection was based upon his desire to pursue a better deal, not on a desire to sue Northwestern. The stockholders did not assert any claim against Northwestern, although the acts now complained of had already occurred. Carl Tuttle explained his vote as follows: "I wanted to avoid foreclosure if I could. I wanted to avoid as much interest owed as possible. I wanted to get out, just to put it bluntly."

The agreement for the sale of the shopping center was signed on 16 September 1976. On 23 September 1976 the parties appeared before the bankruptcy judge to request approval of the sale. Rockingham Square's trustee stated that the parties had "agreed on a basis for resolving all of the various relationships between the bank, the corporation, and the individual stockholders as guarantors which would follow from the sale and employ the proceeds of the sale." The only concern voiced by the attorney for Rockingham Square and Lee Tuttle involved exposure to foreclosure should the bankruptcy proceedings be dismissed and the sale not go through. The next day, 24 September 1976,

the bankruptcy proceedings were dismissed by an order finding that "the stockholders and the Bank have agreed upon a settlement of all obligations and other matters and things in dispute among them." When the sale was subsequently completed, the parties' accord was satisfied. Based upon the above, we conclude that the only reasonable inference to be drawn from the evidence is that the parties' agreement represented a settlement of all matters in dispute among them, exactly as found by the bankruptcy judge. The trial court properly determined that an accord and satisfaction appeared as a matter of law.

Moreover, it appears that summary judgment was properly entered, as the plaintiffs' claims are "utterly baseless in fact." *Kessing v. Mortgage Corp., supra.* For example, plaintiffs' claim for breach of contract is based upon the allegation that Northwestern forced plaintiffs to hire a general contractor even though their contract did not require one. However, the evidence reveals that a general contractor was required by contract. The best that can be said of Tuttle's deposition testimony is that he attempted to talk Northwestern out of the general contractor requirement and that he "didn't know" what stage the construction loan was in when he decided to engage Alvis Hole as general contractor.

Plaintiffs' claim of fraud is based upon the allegation that Northwestern induced them into entering the second permanent loan commitment with Integon by promising to "do whatever was necessary" to help plaintiffs meet Integon's requirement that the borrower and guarantors be solvent. In Tuttle's deposition we find the following:

> Q. Now, you allege in the complaint that somebody at Northwestern made the statement to you that "We'll meet the solvency problem when we get to it or cross that bridge when we get to it" or words to that effect?

> A. Words to that effect; yes, sir.

The deposition is insufficient to show a definite and specific representation by Northwestern to the effect alleged in the complaint. Moreover, the deposition does not show clearly that the above statement was made before acceptance of Integon's second permanent loan commitment. Finally, we note that plaintiffs have failed to show how they were damaged by entering the second

permanent loan commitment. The evidence does not support a claim for actionable fraud. *See generally Ragsdale v. Kennedy*, 286 N.C. 130, 209 S.E. 2d 494 (1974).

Plaintiffs' claims based upon the theories of joint venture and abuse of process also fail. Among other elements, an agreement for the sharing of profits is essential to creation of a joint venture, *Pike v. Trust Co.*, 274 N.C. 1, 161 S.E. 2d 453 (1968); 46 Am. Jur. 2d Joint Ventures § 13 (1969), and the element is lacking herein. Plaintiffs' claim for abuse of process is based upon Northwestern's agreement to delay its foreclosure, in return for certain concessions, while plaintiffs attempted to sell the shopping center. This agreement represented a legitimate effort by the parties to avoid foreclosure, not a "malicious misuse or perversion of a civil or criminal writ to accomplish some purpose not warranted or commanded by the writ." *Barnette v. Woody*, 242 N.C. 424, 431, 88 S.E. 2d 223, 227 (1955).

Finally, plaintiffs group several allegations under claims of negligence and negligent misrepresentation, *see Davidson and Jones, Inc. v. County of New Hanover*, 41 N.C. App. 661, 255 S.E. 2d 580, *disc. rev. denied*, 298 N.C. 295 (1979), and unfair trade practices, *see* N.C. Gen. Stat. 75-1.1; *Johnson v. Insurance Co.*, 300 N.C. 247, 266 S.E. 2d 610 (1980). Suffice it to say that we have reviewed plaintiffs' various allegations and find summary judgment proper as to each of them.

Affirmed.

Judges HEDRICK and WELLS concur.