FALLSTON FINISHING, INC., AND GEORGE T. RUPPE v. FIRST UNION NATIONAL BANK

FIRST UNION NATIONAL BANK OF NORTH CAROLINA v. GEORGE T. RUPPE AND GAYNELLE RAMSEY RUPPE

L & L HOSIERY MILL, INC.; GAY HOSIERY MILL, INC.; RUPPE, DIXON, AND SPEARS, INC. v. FIRST UNION NATIONAL BANK v. GEORGE T. RUPPE, GAYNELLE RAMSEY RUPPE, HAROLD DEAN SPEARS, AND BETTY SPEARS, THIRD-PARTY DEFENDANTS

No. 8426SC1019

(Filed 20 August 1985)

**1. Banks and Banking § 13— loan commitment agreement—insufficient evidence of breach**

The trial court correctly directed a verdict for defendant bank on the issue of the bank's breach of a commitment to loan $100,000 to a hosiery finishing company where commitment letters revealed that the company was promised at most a loan of $100,000 and that the bank loaned such amount to the company.

**2. Damages § 11.1— punitive damages—insufficient evidence**

The trial court properly dismissed plaintiffs' claims for punitive damages where no evidence was presented from which the jury could find that defendant bank's actions, though willful, were malicious.

**3. Banks and Banking § 13— breach of loan commitment—sufficiency of evidence**

Plaintiffs' evidence was sufficient for submission of an issue to the jury as to whether defendant bank breached its commitment to lend the three plaintiff corporations money toward the purchase of a hosiery manufacturing company where plaintiffs produced two letters showing that the bank had agreed to lend plaintiffs some sum of money, and questions of fact remained as to exactly how much money the bank agreed to lend each plaintiff.

**4. Accord and Satisfaction § 1— letter as accord and satisfaction**

The trial court properly decided as a matter of law that, if valid, a letter signed by the parties stating that such agreement and loans to the individual and corporate plaintiffs mentioned therein replaced "any and all loans or commitments now outstanding" constituted an accord and satisfaction of plaintiff corporations' claims against defendant bank for breach of loan commitments.

**5. Cancellation and Rescission of Instruments § 10.2— mental incapacity—sufficiency of evidence**

Plaintiffs' evidence was sufficient for submission to the jury of an issue as to the mental capacity of the individual plaintiff to enter into an accord and satisfaction agreement with defendant bank for himself and as a representative of plaintiff corporations.

**6. Duress § 1— economic duress—sufficiency of evidence**

Plaintiffs' evidence was sufficient for submission of an issue as to whether an accord and satisfaction of plaintiffs' claims against defendant bank for breach of a commitment to lend the individual and corporate plaintiffs money toward the purchase of a hosiery manufacturing company was procured by economic duress where it tended to show that, after defendant bank made it known that it would not lend the money as promised, plaintiffs had the choice of entering the agreement releasing the bank of its previous loan obligations and receiving a portion of the promised money or watching the three corporate plaintiffs and the hosiery manufacturing company collapse.

**7. Duress § 1— simple duress—insufficient evidence**

The trial court did not err in failing to submit to the jury the issue of whether an accord and satisfaction was obtained by defendant bank by simple duress where there was no evidence that defendant at any time owed plaintiffs any fiduciary duty.

**8. Cancellation and Rescission of Instruments § 3.1; Duress § 1— agreement obtained by economic duress—issue of ratification**

An issue as to whether an accord and satisfaction agreement allegedly obtained by economic duress was ratified by plaintiffs should have been submitted to the jury where there was evidence that plaintiffs accepted loans pursuant to that agreement and had those loans extended, and where there was also evidence that the individual plaintiff, who signed the agreement for himself and for plaintiff corporations, did not have the mental capacity to understand the consequences of his actions when he signed the agreement, and that the circumstances constituting the economic duress continued at the time the individual plaintiff signed the agreement.

APPEAL by plaintiffs and defendant from *Burroughs, Judge.* Judgments entered 5 December 1983 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 6 June 1985.

*Hamrick and Hamrick by J. Nat Hamrick for plaintiff appellants-appellees.*

*Hamel, Hamel & Pearce by Reginald S. Hamel for defendant appellant-appellee, First Union National Bank.*

COZORT, Judge.

This case involves a series of complicated business transactions between the parties. The controversy in a nutshell relates to the failure of a business due to the bank's refusal to lend money it allegedly agreed to lend. First Union National Bank is the defendant in two of the above entitled actions and is the plaintiff in the third action. However, for convenience, First

Union National Bank was treated as the defendant at trial and will be hereafter denominated as such on appeal. The other parties to this litigation were treated as plaintiffs at trial and will likewise be designated as such on appeal.

The trial in this consolidated action was tried intermittently, without objection from the parties, from 19 September 1983 through 23 September 1983 and 31 October through 9 November 1983. At the close of the plaintiffs' evidence and again at the close of all the evidence, the defendant made a motion for a directed verdict with regard to several of the plaintiffs' claims for relief. Based on the trial court's partial granting of the defendant's motion, two separate sets of issues were submitted to the jury on different dates. The first set of issues contained four questions regarding the mental capacity of plaintiff, George T. Ruppe. The second set of issues concerned the existence of a contract between the defendant and a plaintiff corporation, the defendant's alleged breach, and the amount of damages, if any.

In response to the jury's answers to the issues submitted, the trial court entered two judgments in favor of the defendant. The plaintiffs, George T. Ruppe and wife, Gaynelle R. Ruppe, and the plaintiff corporations have appealed. For the reasons that follow, we hold the trial court erred in refusing to submit certain questions of fact raised at trial to the jury, and we remand this case for a new trial. The facts follow.

In 1950, plaintiff George T. Ruppe formed a partnership with his brother and entered the hosiery business. In 1958, Ruppe and others, including W. K. Mauney, Jr., and Charles F. Mauney of Mauney Hosiery Mill, formed Ideal Hosiery Corporation, a company which would produce socks.

Although Ideal was subsequently liquidated, Ruppe by 1977 was involved in six hosiery mills. He served as general manager for the three Mauney controlled mills, Cleveland Hosiery Mill, Inc., Can-Do Hosiery Mill, Inc., and Lyntex, Inc., and had controlling interest in plaintiff corporations Gay Hosiery Mill, Inc., Ruppe, Dixon, and Spears, Inc., and L & L Hosiery Mill, Inc.

These mills knitted socks in the greige, but did not have the ability to dye or finish hosiery. Ruppe became interested in acquiring dyeing and finishing equipment capable of handling the

greige production of the three plaintiff corporations which he controlled. Mauney Hosiery handled this part of the production process for the Mauney controlled mills. In the fall of 1977, Ruppe took the first step into the finishing business by starting Fallston Finishing Co., Inc., and purchasing the necessary equipment. Because at this time Ruppe did not have a dyeing operation, he was forced to knit the socks at his three mills, send them to a custom dyer, and bring them back to Fallston for boarding and packaging.

Ruppe soon realized that his operation costs could be substantially reduced if he had the capacity to dye his own socks. In the spring of 1978, Ruppe learned that Hutchens Hosiery Mill, a large hosiery manufacturing company, was for sale and discussed his purchase of the mill with Henkel Hutchens, its owner. Hutchens owned a dyeing facility as well as other machines capable of manufacturing a high quality sock. Ruppe immediately contacted L. E. Hinnant, vice president with the defendant bank, to obtain a loan for purchasing Hutchens. Hinnant claimed that by the first of May in 1978, besides wanting a dyeing facility, Ruppe was obsessed with severing his business relationship with the Mauneys, whom Ruppe believed "had Mafia connections." By acquiring Hutchens, their business ties would necessarily have to be broken because Ruppe's operation would be in competition with Mauney Hosiery Mill.

According to Ruppe, Hinnant stated that he could borrow the money he needed to purchase Hutchens and more if necessary. Ruppe testified that he looked at Mr. Hinnant, pointed his finger, and said: "If I don't get the money I'll go broke."

On 11 May 1978, the defendant bank issued Ruppe two letters signed by Hinnant. One letter stated that the bank would lend Ruppe on an individual basis the sum of $100,000, if needed. The other letter confirmed that the bank would extend to the plaintiff corporations the following lines of credit totaling $300,000:

| | |
|---|---|
| To Gay Hosiery Mill, Inc. | $100,000.00 |
| To L & L Hosiery Mill, Inc. | 50,000.00 |
| To Fallston Finishing, Inc. | 100,000.00 and |
| To Ruppe, Dixon, and Spears, Inc. | 50,000.00 |

On 15 May 1978, the bank sent Ruppe four additional letters signed by Hinnant, committing to extend short-term lines of credit for one year, also totaling $300,000, to Ruppe and the following corporations:

| | |
|---|---|
| To George T. Ruppe and wife | $100,000.00 |
| To Gay Hosiery Mill, Inc. | 100,000.00 |
| To L & L Hosiery Mill, Inc. | 50,000.00 and |
| To Ruppe, Dixon, and Spears, Inc. | 50,000.00 |

Each of these 15 May letters required and received either a signed acceptance from Mr. and Mrs. Ruppe as to their individual line of credit or from Ruppe as an officer of each corporation.

At trial, Ruppe contended that under these letters the bank committed itself to lend him $200,000 and his companies $500,000. Hinnant testified, however, that the 11 May letters were not letters of credit, but merely confirmation letters concerning the subject matter of Ruppe's 11 May conversation with Hinnant and that Ruppe was only promised a $100,000 loan and a $300,000 line of credit among his companies. According to Hinnant, from May until Ruppe bought Hutchens Hosiery in June of 1978, Ruppe would visit the bank six to eight times a day. Hinnant explained that the 11 May letters were issued to assuage Ruppe's fears that the money would be available. Hinnant testified:

> [Ruppe was afraid that] . . . if he got too big, [the Mauneys] might rub him out, and that's the reason he needed these letters to show to his creditors in case something happened to him Mrs. Ruppe could come to the bank and we could work out a loan.
>
> * * * *
>
> I was on the way to a County Commissioners' meeting that morning and I was running late. I got the secretary to type [the 11 May letters] out real quick and I waited to sign them and I told him I would have his regular letters of credit no later than the 15th or 16th.

Hinnant also explained that because the line of credit offered to Fallston on 11 May was made the subject of an actual loan of $100,000 to Fallston on 15 May 1978, no formal commitment letter like those issued on 15 May was necessary.

On 13 June 1978, Fallston Finishing, Inc., entered into a written agreement to purchase the assets of Hutchens Hosiery Mill, Inc., for $590,000. The terms of the sale agreement provided that $45,000 would be paid immediately as a down payment, $245,000 would be paid by 16 June 1978, and the $300,000 balance would be paid in three $100,000 installments every two months thereafter. On 14 June 1978, Ruppe approached the bank requesting a loan of $250,000 to cover the 16 June initial payment. His request was denied. Ruppe, however, raised $290,000 for the down payment and first payment to Hutchens by personally borrowing $100,000 from First Union, adding $18,000 of his own money, borrowing $63,000 from his other companies, and raising $109,000 from investors. The $100,000 was loaned to Ruppe by two separate $50,000 notes dated 13 June and 14 June 1978. According to Hinnant, this $100,000 loan fulfilled the bank's obligation contained in the 15 May 1978 letter. To secure the $300,000 balance owed on the purchase price, Fallston Finishing gave Hutchens a note and security agreement on the knitting, dyeing, and finishing equipment it purchased from Hutchens Hosiery.

Fallston Finishing, Inc., moved into the Hutchens Hosiery Mill on 19 June 1978. Its management began taking over the operation of the mill and began to knit, dye and finish socks. On 30 June 1978 Ruppe resigned as general manager from the three Mauney controlled mills, Cleveland, Can-Do, and Lyntex. The Mauneys eventually got out of Ruppe's three mills, L & L Hosiery, Gay Hosiery, and Ruppe, Dixon, and Spears, Inc.

Ruppe explained at trial that the transition from an operation which predominantly knitted and sold socks in the greige to an operation that sold dyed and finished ones was expensive because his mills were now in competition with former customers, including the Mauneys, who previously had bought his companies' socks in the greige.

On 8 August 1978, seven days before the first $100,000 installment under the Hutchens purchase agreement was due, a dispute arose between Ruppe and First Union as to whether First Union had agreed to lend Ruppe the funds to finance the purchase of the Hutchens Hosiery assets. Ruppe testified: "I asked him if I could get the money and [Hinnant] told me that they didn't have no more commercial money available."

Ruppe attempted to borrow the necessary funds to complete the purchase from three other banks. He requested from the First National Bank of Catawba County a loan of $800,000 to assume Hutchens' loan of $225,000 and $400,000 to pay Hutchens for inventory and equipment. First National, however, would agree to lend Ruppe only $400,000. Ruppe also approached First Citizens Bank and Trust Company for a loan, but was turned down. Independence Bank offered Ruppe a loan of $500,000. Ruppe testified that as a condition of the loan Independence requested the personal guaranty of the stockholders in all the mills, which Ruppe felt was impossible.

During this time the operating capital of the plaintiff corporations was beginning to dry up, making their continued operation difficult. Ruppe and his associates were still trying to find customers for their finished socks, and orders for socks in the greige from their former customers were few. Also, by this time, the first installment towards the Hutchens purchase was past due.

In early September of 1978, J. T. Staples, a First Union assistant vice-president and area loan administrator, circulated two interoffice memos revealing First Union's position. On 1 September, he wrote:

Yesterday afternoon, we had a rather heated meeting, at which time, George [Ruppe] told me he had firm commitments from Josh [Hinnant] on Gay Hosiery for $100M, Ruppe, Dixon & Spears for $50M, and L & L Hosiery Mill for $50M . . . all dated May 15, 1978. These letters were in Josh's file, and the first time I was aware of their existence was yesterday afternoon. Based on this, I felt we were committed to try and work out some kind of amicable arrangement. Up until that time, I thought we had a relatively good chance of possibly backing out.

. . . The only loophole that I can see at this time is that the funds were agreed to be loaned to the individual companies for short term needs, not for acquisition of capital assets, and this may have violated the good faith of the agreement.

On 11 September 1978, Staples further related:

[The bank's attorney's] opinion was that we were legally obligated to fund these commitments if requested to do so by the related companies. It was acknowledged that the request for funding had already been made. However, he did state that we could renege on our commitments, but that we would be subject to actual plus punative [sic] damages and that the latter could easily hit seven figures.

We explored the possibility of using falsified financial statements as a defense, but [our attorney] felt that was a very thin possibility. Eric's [Dunn, assistant regional loan administrator] idea about the purpose of the commitment (short term line) vs. the use of the funds (purchase of plant) was also discounted by [our attorney] as not being defendable.

During the latter part of September 1978, Ruppe suffered a nervous breakdown. He was hospitalized on 17 September 1978 for psychiatric help after attempting suicide by taking an overdose of Valium. Ruppe testified that when he realized he could not borrow the necessary money he "felt the whole world had come out from under [him]." George Ruppe's son, Jerry Ruppe, drove him to the hospital and observed: "He was just there. He couldn't talk, didn't know his name, couldn't write." Jerry Ruppe further related that when his father was released from the hospital two weeks later he was still in the same condition. According to Tony Ruppe, George Ruppe's other son, his father had not recovered as of the time of trial in September of 1983.

Ruppe's mills suffered further financially while Ruppe was in the hospital. Tony Ruppe testified that when the Hutchens Hosiery purchase collapsed he tried to find customers for their greige goods. However, his father was the only person who had ever done any selling. Tony Ruppe testified: "We tried to call up some of the people we had done business with in the past. Some of them we just begged. We told them the shape daddy was in. He was in the hospital. We just had to have something to run." With the mills on the verge of collapse and his father in the hospital, Tony Ruppe went back to First Union to work out some arrangement to save the mills.

On 27 September 1978, George Ruppe was released from the hospital to attend a meeting between the parties the next day. J. T. Staples, George Ruppe, Tony Ruppe and others were pres-

ent and an agreement was reached whereby First Union agreed to lend Ruppe and his companies certain sums of money in exchange for a release of all claims against the bank. This agreement was reduced to writing by a letter dated 29 September 1978 signed by Staples and Ruppe as an individual and in his corporate capacity. The next to the last paragraph in this letter stated:

> George, please understand that the loans offered in the preceding are subject to the conditions listed and the completion of Business Loan Agreements on each separate company similar to those already in effect. Additionally, when this letter is signed, acknowledging your acceptance of this offer, you understand that these are the only loans that will be made to you and your companies and that they will replace any and all loans or commitments now outstanding.

At trial, First Union contended this accepted and signed letter constituted an "accord and satisfaction." On 13 October 1978, the parties met, and various notes were signed and loans were made according to the 29 September letter. A summary of these loans follows:

> George Ruppe—loaned $102,995.88 to pay off his two $50,000 notes;
>
> Fallston Finishing, Inc.—loaned $103,723.28 to pay off its $100,000 note;
>
> Gay Hosiery—loaned $125,000 to pay off its previous indebtedness of $53,637.61 and interest;
>
> L & L Hosiery—loaned $100,000 to pay off its previous indebtedness of $50,436.17, plus interest owed;
>
> Ruppe, Dixon, and Spears, Inc.—loaned $140,000 to pay off its previous indebtedness of $113,401.91.

In all, First Union loaned the various plaintiffs a total of $154,273.47 in new money under the 29 September agreement.

On 26 October 1978, realizing that Fallston would not be able to pay off its $300,000 purchase money note as agreed, Hutchens Hosiery agreed to cancel the indebtedness in exchange for its knitting equipment Ruppe had previously purchased. Fallston agreed to vacate the Hutchens Hosiery building by December of

1978. By the end of 1978, Ruppe and the plaintiff corporations had paid off the First Union loan to Fallston.

In January of 1979, Fallston Finishing was shut down and Ruppe's individual 13 October 1978 loan of $102,995.88 was renewed. In January of 1980, Ruppe and Fallston Finishing filed an action against First Union for damages for its refusal to loan the money it had agreed to loan in May of 1978. In April of 1980, Ruppe stopped making payments on his individual note. First Union unsuccessfully demanded payment of the loan in June of 1980 and again on 19 March 1981. First Union filed its action against Ruppe and his wife for payment of this note on 27 March 1981.

Gay Hosiery, L & L Hosiery, and Ruppe, Dixon, and Spears, Inc., had their 13 October 1978 loans extended on 14 June 1979 and made payments on their notes through 16 February 1981. First Union demanded payment of these loans on 4 May 1981. Later, on 30 July 1981, these plaintiff corporations filed an action against First Union alleging that they had been damaged due to the bank's failure to lend Fallston Finishing money to complete the Hutchens Hosiery purchase. First Union counterclaimed for the amount these corporations owed on the 13 October 1978 loans and impleaded Ruppe and his wife and Harold Spears and his wife as third-party defendants based on their execution of unconditional guaranties underwriting loans extended to Gay Hosiery and Ruppe, Dixon, and Spears, Inc.

At the close of all the evidence, the defendant bank moved to strike the plaintiffs' duress averments in the pleadings on the grounds that they were not specifically alleged as required under G.S. 1A-1, Rule 9(b). First Union also made a motion for a directed verdict under G.S. 1A-1, Rule 50, on several of the plaintiffs' claims and on some claims on which it carried the burden of proof. Although the trial judge and the parties discuss the bank's motion only in directed verdict terms, we note that several of the "claims" are in reality issues of fact that the bank felt should not be submitted, for various reasons, to the jury for consideration.

In the first place, the defendant bank moved for a directed verdict on all of the plaintiffs' claims against the bank. These included: (1) Ruppe's claim of breach of commitment to loan him personally $100,000; (2) Fallston Finishing's breach of commitment

claim to loan it $100,000; (3) Fallston's claims for punitive damages against the bank for maliciously conspiring to breach its loan commitment; (4) George and Gaynelle Ruppe's claims for punitive damages for maliciously and wrongfully bringing an action to recover on the 13 October 1978 note knowingly obtained under duress; (5) Gaynelle Ruppe's claim for actual damages for mental anguish suffered due to the bank's actions; and (6) the plaintiff corporations', Gay Hosiery, L & L Hosiery, and Ruppe, Dixon, and Spears, Inc., claims of breach of commitment to loan them money for the purchase of Hutchens Hosiery Mill.

The trial court granted the defendant bank's motion for a directed verdict with regard to all these claims, except as to whether the bank breached its contract to loan Ruppe and L & L Hosiery certain monies. The issue of whether the bank breached its loan contract with Ruppe and L & L Hosiery was later submitted to the jury and answered in the negative.

The defendant bank in its motion also asked for a directed verdict on several issues on which it had the burden of proof which is proper under certain circumstances according to *Bank v. Burnette*, 297 N.C. 524, 256 S.E. 2d 388 (1979). The bank requested that the trial court not submit the issue of whether the 29 September 1978 letter constituted an accord and satisfaction. Instead, the bank sought a ruling that under the evidence the letter complied with the requirements of G.S. 1-540 as a matter of law. The trial court agreed and decided to submit to the jury only the question of whether plaintiff George T. Ruppe had the requisite mental capacity to enter into this agreement. However, the trial judge refused to allow the jury to decide whether the agreement was signed by Ruppe under duress or economic duress, two other defenses to the accord and satisfaction issue presented by the plaintiffs.

Furthermore, the trial court, pursuant to the bank's motion, refused to submit the issue of whether the plaintiffs' acceptance of the loaned money under this agreement and their extension of these loans in January and in June of 1979 constituted a ratification of the 29 September 1978 agreement, regardless of Ruppe's mental capacity at the time.

Finally, the bank requested that directed verdicts be entered in its favor on the amounts due on the 13 October 1978 loans

made according to the 29 September 1978 agreement. When the jury answered the issue that Ruppe lacked sufficient mental capacity on 29 September 1978 to enter into the accord and satisfaction, the trial court nevertheless entered judgment against L & L Hosiery; Gay Hosiery; Ruppe, Dixon, and Spears, Inc.; and George and Gaynelle Ruppe on the balances due on the sums loaned to them on 13 October 1978.

Although the plaintiffs have presented eighty-eight questions for our review dealing with various alleged errors committed at trial, the overwhelming question to be determined on this appeal is whether the trial court erred in granting the defendant's motion for a directed verdict and refusing to submit to the jury virtually all the issues raised at trial.

A motion for a directed verdict questions "whether the evidence was sufficient to entitle the plaintiff to have a jury pass on it." *Hunt v. Montgomery Ward and Co.*, 49 N.C. App. 642, 644, 272 S.E. 2d 357, 359 (1980). We are faced on appeal with "the identical question which was presented to the trial court . . . namely, whether the evidence, when considered in the light most favorable to plaintiff, was sufficient for submission to the jury." *Kelly v. Harvester Co.*, 278 N.C. 153, 157, 179 S.E. 2d 396, 397 (1971). If the court finds more than a scintilla of evidence to support the plaintiff's *prima facie* case in all its constituent elements, the motion should be denied. *Hunt v. Montgomery Ward and Co.*, 49 N.C. App. at 644, 272 S.E. 2d at 360.

[1, 2] We agree that the trial court correctly directed a verdict in favor of the bank on the issue of the bank's breach of commitment to loan $100,000 to Fallston Finishing. The uncontroverted evidence at trial revealed that under the 11 May and 15 May 1978 commitment letters Fallston was only promised at most a loan of $100,000 and that on 15 May 1978, Fallston Finishing was loaned $100,000. Moreover, we hold that the trial court properly dismissed the plaintiffs' respective claims for punitive damages. There was no evidence presented at trial by the plaintiffs from which the jury could find that the bank's actions, although willful, were malicious. Similarly, since no evidence was presented at trial concerning Gaynelle Ruppe's claim for damages due to mental anguish, we hold the trial court properly dismissed this claim for relief.

[3]    However, we think the trial court improperly refused to sub-
mit to the jury the issues of whether the bank breached its com-
mitment to loan Ruppe, Gay Hosiery, and Ruppe, Dixon, and
Spears, Inc., money towards the Hutchens Hosiery purchase. As
noted earlier, the trial court did allow the jury to determine
whether L & L Hosiery had a loan commitment from the bank
and whether that commitment was breached. We take time to
note at this point, however, that when this case is retried, the
issues of whether the bank contracted to loan money to L & L
Hosiery and whether it breached that contract must be resubmit-
ted to the jury. These issues as framed are improper. They ask
whether there was a contract and breach by the bank to loan
"George T. Ruppe and L & L Hosiery" certain monies. From our
review of the record, there was no evidence that Ruppe as an in-
dividual signed the loan commitment to L & L Hosiery from the
bank. There was also no evidence presented that Ruppe ever per-
sonally guaranteed a loan for L & L Hosiery. Because under these
facts the issues are ambiguous, we hold the issue of whether the
bank breached its commitment to loan L & L Hosiery money
must be submitted to the jury in proper form. *See* G.S. 1A-1, Rule
49(b).

    In any event, our review of the evidence indicates that
Ruppe, Gay Hosiery, and Ruppe, Dixon, and Spears, Inc., like
L & L Hosiery, presented a *prima facie* case concerning the
bank's loan commitments. By producing the actual 11 May and 15
May letters themselves, Ruppe and these plaintiff corporations
showed that the defendant bank had agreed to lend some sum of
money. Surely, questions of facts remained as to exactly how
much money the bank promised to lend.

    The plaintiffs asserted that under the 11 May and 15 May
1978 letters the bank agreed to lend Ruppe as an individual
$200,000; Gay Hosiery, $200,000; Ruppe, Dixon, and Spears, Inc.,
$100,000; and L & L Hosiery, $100,000. The defendant bank con-
tended that these letters referred to the same loans and that the
bank had only agreed to lend $100,000, $100,000, $50,000, and
$50,000 to Ruppe and the plaintiff corporations respectively. All
of the plaintiffs were therefore entitled to have the jury pass on
whether the bank contracted to lend them money, how much the
bank promised to lend, and whether the bank breached its com-
mitment to lend those amounts.

[4] We note that these issues would be rendered moot if the bank's accord and satisfaction defense were upheld. The bank introduced as evidence of an accord and satisfaction the 29 September 1978 letter signed by the requisite parties stating that this agreement and the loans mentioned therein replaced "any and all loans or commitments now outstanding." The defendant bank's "plea of accord and satisfaction 'is recognized as a method of discharging a contract, or settling a cause of action arising either from a contract or a tort, by substituting for such contract or cause of action an agreement for the satisfaction thereof, and an execution of such substitute agreement.' . . . [Citation omitted.]" *Shopping Center v. Life Insurance Corp.*, 52 N.C. App. 633, 642-43, 279 S.E. 2d 918, 924-25, *disc. rev. denied*, 304 N.C. 196, 285 S.E. 2d 101 (1981). This concept is codified in G.S. 1-540. This statute provides:

> In all claims, or money demands, of whatever kind, and howsoever due, where an agreement is made and accepted for a less amount than that demanded or claimed to be due, in satisfaction thereof, the payment of the less amount according to such agreement in compromise of the whole is a full and complete discharge of the same.

The trial court found that the 29 September 1978 letter was "an accord and satisfaction on a compromise settlement." Although normally the existence of an accord and satisfaction is a question of fact for the jury, where the only reasonable inference is existence or nonexistence, accord and satisfaction is a question of law. *Shopping Center v. Life Insurance Corp.*, 52 N.C. App. at 643, 279 S.E. 2d at 925. We agree with the trial judge and hold that it properly decided as a matter of law that, if valid, this letter represented an accord and satisfaction of the plaintiff corporations' breach of loan commitment claims.

[5] We further hold, contrary to the defendant bank's position, that the trial court properly submitted to the jury the issue of Ruppe's mental capacity to enter into the agreement for himself and as a representative of his corporations. Although there was no question of fact that this accord and satisfaction agreement existed, there were questions of fact for the jury to determine relating to whether this agreement was valid. George Ruppe's mental capacity at the time the agreement was executed was one

such question. Our review of the record shows that the plaintiffs presented sufficient evidence to require the submission of the issue of Ruppe's mental capacity to the jury.

The jury answered the mental capacity issue in favor of the plaintiffs. The trial court, however, inconsistent with the jury's answer to this issue, ordered the plaintiffs to pay the balances then due on the 13 October 1978 loans. Nothing else appearing, because the loans were made pursuant to the 29 September accord and satisfaction agreement and as a result of the same conditions as those present at that time, we hold the trial court erred in directing a verdict in favor of the bank on those loans. We, therefore, vacate the 5 December 1983 judgment entered against L & L Hosiery, Gay Hosiery, Ruppe, Dixon, and Spears, Inc. and George and Gaynelle Ruppe on these loans.

[6]   We also hold that the trial court erred in refusing to submit to the jury the issue of economic duress, another defense presented by the plaintiffs to the validity of the accord and satisfaction agreement. In *Rose v. Materials Co.*, 282 N.C. 643, 194 S.E. 2d 521 (1973), the Supreme Court discussed the question of whether a threat of breach of contract could amount to economic duress. In *Rose*, the Supreme Court related:

> What are the essential characteristics of economic duress? "A threatened violation of a contractual duty ordinarily is not in itself coercive, but if failure to receive the promised performance will result in irreparable injury to business, the threat may involve duress." [Citation omitted.]

> "[A] threat to breach a contract, if it does create severe economic pressure upon the other party, can constitute duress where the threat is effective because of economic power not derived from the contract itself." [Citation omitted.]

> "It must also appear that the threatened party could not obtain the goods from another source of supply. . . ." [Citation omitted.] In addition, it must appear that there was "no immediate and adequate remedy in the courts" which would enable the buyer to resist the seller's demand. [Citation omitted.]

*Id.* at 665, 194 S.E. 2d at 536. Our review of the trial transcript indicates that the plaintiffs presented a *prima facie* case of economic duress. The plaintiffs offered substantial evidence of a breach or a threat of a breach by the bank of its loan commitments to the plaintiffs. According to the plaintiffs' evidence, this breach caused them great financial hardship which induced Ruppe, for himself and his companies, to enter into the accord and satisfaction agreement. Considering the plaintiffs' evidence in its most favorable light, it appears that, after the bank made it known that it would not lend the money as promised under the 11 May and 15 May 1978 letters, Ruppe and his companies had two choices: (1) enter the 29 September agreement, releasing the bank of its previous loan obligations, and receive some money, or (2) watch all four of the companies collapse. It is also evident that the bank's ability to destroy Ruppe's companies did not come as a result of their loan contracts alone. Surely, it was for the jury to determine whether the bank's actions amounted to economic duress and whether Ruppe had any other alternate sources from which he could get the necessary funds.

[7]    The individual plaintiffs, George and Gaynelle Ruppe, further contend on appeal that the trial court erred by failing to submit the issue that the bank's actions amounted to simple duress. We disagree based on the fact that these plaintiffs presented no evidence that the bank owed them at any time any fiduciary duty. *See Housing, Inc. v. Weaver*, 37 N.C. App. 284, 246 S.E. 2d 219 (1978), *affirmed per curiam*, 296 N.C. 581, 251 S.E. 2d 457 (1979). We hold the trial court properly refused to submit this issue to the jury.

[8]    Finally, the defendant bank contends that all of the trial judge's alleged errors are of no consequence in this case because he properly granted its motion for a directed verdict on the issue of ratification. Essentially, the bank argues that in spite of the plaintiffs' defenses, the validity of the accord and satisfaction agreement cannot be questioned because all the evidence at trial shows that the plaintiff Ruppe and the plaintiff corporations ratified the 29 September 1978 agreement by accepting the loans pursuant to that agreement on 13 October 1978 and by having those loans extended in January and in June of 1979.

As a general proposition, a transaction procured by duress may be ratified by the victim so as to preclude a subsequent suit to set the transaction aside. *Id.* at 299, 246 S.E. 2d at 227. However, the victim's act will not constitute a ratification unless at the time of the act, the victim had full knowledge of the facts and was then capable of acting freely. *Link v. Link*, 278 N.C. 181, 197, 179 S.E. 2d 697, 706-07 (1971). Thus, there would be no ratification if at the time of the plaintiffs' acts the circumstances constituting the economic duress remained and Ruppe's mental capacity had not yet returned. *See Housing, Inc. v. Weaver*, 37 N.C. App. at 300, 246 S.E. 2d at 228.

We hold that in the present case the question of whether the plaintiffs ratified the accord and satisfaction by their actions was for the jury. There was sufficient evidence from which the jury could find that in October of 1978 or even at the time of trial Ruppe did not have the mental capacity to understand the consequences of his actions. Also, by virtue of the fact that the plaintiffs had to have the October 1978 loans extended, there was ample evidence that the conditions which gave rise to the economic duress in the first place continued. The trial court, therefore, improperly refused to submit this issue to the jury.

Finally, although the defendant bank also technically gave notice of appeal at trial, we fail to see how it can be viewed as an aggrieved party and decline to review its assignments of error which have not been intermittently discussed within.

In summary, we affirm (1) the entry of directed verdict for the defendant bank on Fallston Finishing's claim of breach of the loan commitment; (2) the dismissal of the plaintiffs' claims for punitive damages; (3) the dismissal of Gaynelle Ruppe's claim for damages for mental anguish; and (4) the court's refusing to submit to the jury the issue of whether the defendant bank's actions constituted simple duress as to George Ruppe and Gaynelle Ruppe. We reverse (1) the entry of directed verdict against George Ruppe; Gay Hosiery; and Ruppe, Dixon, and Spears, Inc., on their claims that the bank breached its commitment to loan money to them; (2) the trial court's wording of the issue of whether the bank breached its commitment to loan money to L & L Hosiery; (3) the trial court's order to L & L Hosiery; Gay Hosiery; Ruppe, Dixon & Spears, Inc.; and George and Gaynelle Ruppe to pay to

the bank the balances owed on the 13 October 1978 loans; (4) the trial court's refusal to submit to the jury the issue of economic duress; and (5) the trial court's refusal to submit to the jury the issue of ratification of the 29 September 1978 agreement. Accordingly, we order a

New trial.

Judges WELLS and JOHNSON concur.