JOHN F. LAWLESS, Plaintiff-Appellant, v. CENTRAL PRODUCTION CREDIT ASSOCIATION, Defendant-Appellee.

Fourth District   No. 4—91—0540

Opinion filed May 20, 1992.—Rehearing denied June 17, 1992.

COOK, J., concurring in part and dissenting in part.

M. Corine Corley, of Arens & Alexander, of Fayetteville, Arkansas, for appellant.

Jeffrey D. Richardson, of Decatur, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiff John F. Lawless appeals from a summary judgment entered in the circuit court of Champaign County in favor of defendant Central Production Credit Association. Plaintiff's action sought to recover damages for the alleged tortious interference by defendant in plaintiff's contract of employment with the Farmers Home Administration (FmHA) and for economic duress. The issues raised on appeal by plaintiff are whether the granting of summary judgment *ex parte* and without a hearing requires reversal and whether there remain such genuine issues of material fact that the motion for summary judgment should have been denied.

Count I of plaintiff's complaint (interference with a contractual relationship) alleged he is a resident of Terre Haute, Indiana, and was from 1961 until 1988 an employee of the FmHA. From 1963 until April 1986, he was the county supervisor assigned to the Lawrenceville, Illinois, office. From 1967 until 1987, he also conducted an ongoing farm operation in Crawford and Lawrence Counties, Illinois. As county supervisor, plaintiff was responsible for primary loan servicing for farmers, consumers, and municipal organizations seeking low-in-

terest government financing. He also conducted business for the United States government in concert with other creditors, including defendant, by making loans and participating in the subordination of loans and guarantees on loans to assist FmHA borrowers in obtaining a sound financial position.

As a farmer, plaintiff borrowed money from defendant. From 1980 to 1985, plaintiff experienced financial difficulties. As a result, plaintiff filed a petition for bankruptcy. It is alleged that at that time, plaintiff had a good relationship with FmHA and creditors with whom he worked, including defendant. Plaintiff owed defendant over $500,000. The bankruptcy court determined this debt to be partially unsecured and, as a consequence, defendant had to write off some or all of the $500,000 debt. Plaintiff alleged defendant retaliated, an allegation which defendant's answer denied. According to plaintiff's complaint, Donald W. Cochran, president of the Southeastern Illinois Farm Credit System and an officer of defendant, met with FmHA officers, and based on the demands of defendant, FmHA decided to remove plaintiff from the Lawrence County office and temporarily assign him to the office in Champaign. Plaintiff further alleges that by letter dated April 27, 1986, he was informed he was removed from the Lawrence County office and permanently relieved of his duties as county supervisor. On that date he was transferred to the State office in Champaign, Illinois. In September 1987, plaintiff was informed that involuntary termination proceedings were commencing against him, and in November 1987, plaintiff was offered the opportunity to take early retirement instead of being involuntarily terminated. Plaintiff alleged his removal as county supervisor and the requirement that he take early retirement or face involuntary termination was without justification and that defendant intended to cause and did cause these actions by FmHA. The damages which plaintiff alleged were directly and proximately caused by defendant are physical ailments, loss of job and salary, loss of full retirement benefits, loss of full health and life insurance coverage and other benefits, loss of his personal reputation, loss of other advancement or additional pension benefits, and other economic losses.

Count II of plaintiff's complaint (economic duress) additionally alleged that defendant intended to retaliate and force plaintiff from his job and that defendant's acts were performed in bad faith with the intention of punishing plaintiff for exercising his statutory right to file for protection under the bankruptcy laws. Plaintiff alleged that defendant's demands for his removal included the threat of uncooperative lending decisions involving joint lending practices between

defendant and FmHA, and that FmHA decided to remove plaintiff as an employee rather than develop problems with defendant. According to plaintiff's complaint, that is the result intended by defendant.

Defendant's answer denied all allegations of tortious conduct and alleged five affirmative defenses. Defendant's motion for summary judgment was based on answers to interrogatories and discovery depositions which defendant stated established that FmHA's temporary reassignment of plaintiff was made solely at the request of the Federal investigators from the Office of Inspector General (OIG), which was investigating allegations of official misconduct by plaintiff; and as a further result of this investigation, several instances of alleged misconduct were discovered such that FmHA proposed to fire plaintiff on August 27, 1987, and none of these instances involved defendant.

The motion for summary judgment was filed by defendant on November 21, 1990. Also filed on that date by defendant were a brief in support of the motion for summary judgment, a motion for sanctions, a brief in support of the motion for sanctions, and a proof of service of sending copies of discovery depositions to plaintiff's attorneys. The proofs of service for each document indicated these documents were mailed to plaintiff's attorneys of record on November 20, 1990. The docket entry of January 3, 1991, indicated that the defendant's motion for summary judgment was granted on that date.

On February 1, 1991, plaintiff filed a motion to vacate the summary judgment and a brief in support thereof. Attached as exhibits were (1) a portion of the deposition of Robert Chambers, FmHA's director for the State of Illinois; (2) a copy of a memorandum from Terry G. Dodd, a farmer program specialist, to Chambers; and (3) an affidavit from plaintiff. On February 13, 1991, defendant filed a brief in opposition to the motion to vacate. On that date, the motion to vacate the summary judgment was denied.

In his discovery deposition, Terry Dodd, a farmer program specialist for FmHA, stated he had no direct authority over plaintiff as a county supervisor although he could make recommendations. When Dodd became a farmer program specialist, this was considered a higher pay and grade level than county supervisor. On March 19, 1986, Dodd wrote a memorandum to Chambers regarding plaintiff. The memorandum stated:

> "On March 13, 1986, Roger Witt, Norbert Soltwedel, Clyde Fife and I met with Donald Cochran, President of the Southeastern Illinois Farm Credit System. Following this meeting Cochran asked to talk to Roger Witt and me.

Cochran said he was very concerned with the situation in Lawrenceville. There have been no lines of communication with our Lawrenceville office since John Lawless filed Chapter-7. He said they had taken a hit for $500,000. He has not met John or attempted to meet with him. Cochran said he realizes they (PCA [Production Credit Association]) have not been blameless in the lack of communication; however, he didn't feel the main problem was theirs.

Cochran said they have very good relations with FmHA throughout his district. He did mention Marion County troubles, but felt those may be more their problem than FmHA.

I asked Cochran what could be done, if anything, to resolve the differences at Lawrenceville. I asked if a meeting could be arranged. He did not feel a meeting would resolve anything. His only suggestion was for Lawless to be moved.

Cochran also expressed displeasure about two OIG investigations which were conducted at Lawrenceville. PCA felt that within 24 hours of meeting with the investigator, the information they had given got back to John. Roger Witt and I were concerned on this. Witt said OIG is usually very careful. Cochran said they became aware through two sources that John knew what was said.

Cochran said as a result of the bankruptcy PCA had Don Hoagland, the trustee, sell their security. At the sale they bought some land and apartments which they had liens on. Apparently John has since been seen attempting to break into the apartments. Cochran says if it happens again, they will not hesitate to take court action.

It did not appear PCA was willing to overlook their loss and attempt to resolve their differences with John. I suggested they may attempt to work through District Director Fife or Assistant County Supervisor Mike Smith. Cochran was not aware we had an assistant in Lawrenceville. He did not appear optimistic that a solution could be found."

Dodd explained that Witt was from the national office and they were touring offices. Witt's visit had nothing to do with plaintiff. Soltwedel was the county supervisor in Effingham, and Fife was the district director. Fife's district included the Lawrenceville office. The subject of the scheduled meeting was unrelated to plaintiff. Dodd explained his understanding of the problem referred to in the memorandum to be that defendant was not getting government-backed loans out of the Lawrenceville office. As far as plaintiff's filing for bankruptcy, Dodd

believed it could create a public relations problem with respect to how the agency was perceived, but he does not recall any specific conversation with FmHA employees concerning the subject of plaintiff's bankruptcy. Dodd wrote the memorandum at Chamber's request when Dodd attempted to tell him the concerns expressed by Cochran. Dodd's recollection was that Cochran wanted plaintiff moved. Had Cochran asked that plaintiff be fired, Dodd would have written it in the memorandum. Dodd has no personal knowledge of the OIG investigation. Following this, Dodd never again discussed plaintiff with Chambers. After plaintiff was transferred, plaintiff worked in the Champaign office. This is the office Dodd worked in also. Plaintiff primarily worked on debt settlement cases. Dodd understood the investigators wanted plaintiff out of the Lawrenceville office pending the investigation. He did not have any knowledge of the transfer being related to Cochran's complaint. Dodd was involved in one problem at Lawrenceville concerning a number of financing statements that had expired. Most had expired while plaintiff was county supervisor, although there were two which expired thereafter. When Dodd arrived at the office, someone had gone out and picked up the financing continuations and the problem had been eliminated. Dodd characterized plaintiff as being more difficult than most county supervisors to get along with. Again, Dodd indicated Cochran suggested plaintiff be moved to another location, not "removed." Cochran made no threats and Dodd understood Cochran had no authority to order it be done. Dodd, Witt, and Cochran were exploring possible ways to resolve the problem and one solution suggested by Cochran was to move plaintiff. Dodd did not view his memorandum as a recommendation to discharge plaintiff. Chambers did not indicate he wanted the memorandum to have a basis for firing plaintiff. Chambers did not indicate to Dodd that plaintiff would be moved to the State office in Champaign, nor did Chambers ever discuss with Dodd why plaintiff was moved. The only time he ever discussed these problems with Cochran was on March 13, 1986, and neither Cochran nor anyone else from defendant ever followed up with a communication to Dodd. Nor does Dodd recall any specific conversations with plaintiff concerning his removal from Lawrenceville. Throughout the deposition, plaintiff's attorney continually tried to get Dodd to say Cochran was outwardly angry about the $500,000 loss on plaintiff's loan. Except for saying that it would be understandable that a person would be upset or concerned, Dodd characterized the conversation as a civilized business discussion.

Robert W. Chambers testified in his discovery deposition that he is the director of the State of Illinois for the FmHA and he had been

the State director for nine years. Plaintiff was a county supervisor when Chambers became State director. Chambers identified the letter from him to plaintiff dated April 23, 1986. This letter read as follows:

"This is official notice that you are being detailed to the State Office as an Acting Farmer Program Specialist effective April 29, 1986. The detail will last until OIG has completed an investigation in the Lawrenceville County Office. You will not communicate with any of your County Office employees concerning business matters while the investigation is being conducted.

You may not go to the County Office until the investigation has been completed. Consequently, I am requiring that you turn over your office keys to Judy Bachman.

Any annual leave previously approved is hereby cancelled and any leave request during your detail to the State Office must be approved by me.

You are expected to report for duty to the State Office by 10:00 AM on Tuesday, April 29, 1986."

Chambers explained that two or three days prior to the date of the letter, he had a visit in his office from three men from OIG, including the deputy regional director of the OIG. Chambers was informed they had reason to conduct a full-scale investigation of the Lawrenceville office and asked that plaintiff and Pauline Johnson be removed from the office so that the investigation could be conducted without interference. The letter was a result of that request. Plaintiff was not terminated from his position as county supervisor, but was assigned to the Champaign office pending the investigation. Plaintiff's grade level was not reduced by this reassignment. Chambers identified a series of letters in which he notified plaintiff of the extensions of the detailing of plaintiff to Champaign. Those extensions were due to the fact that the investigation had not been completed. Johnson was also detailed out of the Lawrenceville office. Chambers did not believe she was returned to the Lawrenceville office prior to the completion of the investigation.

Chambers next identified a document as a letter from him to plaintiff dated April 27, 1987. In this letter, plaintiff was notified of the proposal to remove plaintiff from his position with FmHA and the reasons therefor. Chambers stated there is nothing in this letter indicating defendant caused plaintiff to be removed from his position and he had no knowledge of defendant causing plaintiff to be removed. The letter was not prepared by Chambers, but went out over his signature. It was put together by the OIG and the personnel relations

department in the FmHA national office. Deposition exhibit No. 4 was identified as the memorandum from the regional inspector general to Chambers setting forth the results of the investigation. Chambers did not recall whether Johnson received a letter proposing to remove her. He stated it seemed to him she retired prior to that being done, but a letter probably would have been sent had she not retired. Deposition exhibit No. 5 was the memorandum from Dodd. Chambers did not remember receiving any written direct communication from defendant about plaintiff. Chambers was aware there were not very good communications between plaintiff and other lenders in his region. He had complaints from other lenders to that effect. FmHA was in the middle of "a very strong campaign to increase the type of loans from direct to guaranteed, and it took a strong approach from our supervisors to open up a line of communications with these private lenders, whether they be the banks, [defendant] or whatever. And it appears that they did not have that rapport out of that office." Chambers did not remember what action, if any, he took based on Dodd's memorandum, but plaintiff was not detailed to Champaign as a result of this memorandum. Had the investigation not turned out the way it did, plaintiff probably would not have been removed, although he may not have been returned to Lawrenceville. Chambers could have assigned him to another county office.

Among the additional documents filed in support of the motion for summary judgment was a request for admission which stated that "Exhibit B" was a true and exact copy of the May 28, 1987, grievance denial with respect to plaintiff, omitting page one. This request to admit was not denied by plaintiff. The grievance concerned plaintiff's being detailed to the State office as an acting farmer program specialist. The grievance examiner concluded the detailing was proper and necessary and that insufficient evidence was presented by plaintiff to establish it was an act of reprisal. It further indicated that plaintiff retained his GS-11 grade while being detailed. There were also plaintiff's answers to interrogatories which do not disclose any facts contrary to those in the depositions. As already noted, attached to plaintiff's motion to vacate the summary judgment was a part of Chambers' deposition and a copy of Dodd's memorandum, both of which have already been discussed. There was also an affidavit of plaintiff.

In determining the propriety of granting summary judgment, the trial court should construe pleadings, depositions, admissions, exhibits, and affidavits strictly against the movant and liberally in favor of the respondent. Although inferences may be drawn from undis-

puted facts, an issue should be decided by the trier of fact and summary judgment denied where reasonable persons could draw divergent inferences from the undisputed facts. *Pyne v. Witmer* (1989), 129 Ill. 2d 351, 357-59, 543 N.E.2d 1304, 1307-08.

■ Count I of plaintiff's complaint alleges a cause of action for tortious interference with a contractual relationship. The elements of this tort are (1) the existence of a valid contract; (2) defendant's knowledge of the contract; (3) intentional and malicious inducement of the breach; (4) a subsequent breach by a third person due to defendant's wrongful conduct; and (5) damages resulting from the breach. (*Audition Division, Ltd. v. Better Business Bureau of Metropolitan Chicago, Inc.* (1983), 120 Ill. App. 3d 254, 258, 458 N.E.2d 115, 120; *Zamouski v. Gerrard* (1971), 1 Ill. App. 3d 890, 897, 275 N.E.2d 429, 433.) The argument of the parties focuses on whether the plaintiff's termination was a breach due to defendant's wrongful conduct.

■ Defendant cites *Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 466 N.E.2d 1137, for the proposition that a transfer is not actionable under this cause of action. In *Heying,* a nurse was transferred to a different unit of the same hospital and the court held such a transfer was not "constructive termination." In this case, plaintiff was transferred from Lawrenceville to Champaign. Plaintiff did not allege the different location caused him to quit or retire because of extended travel time or some such other inconvenience. No constructive termination occurred as a result of the transfer. The transfer is just a fact probative of whether the subsequent termination was due to defendant's conduct.

■ There is no question defendant complained to an FmHA representative about plaintiff and requested he be transferred. However, Chambers indicated this was not the basis for plaintiff's transfer. Instead, there was an ongoing OIG investigation in relation to which plaintiff's transfer was requested. There is nothing in the record which suggests the OIG investigation was prompted by complaints from defendant or that the OIG investigation was a subterfuge or calculated to cover the fact that the real reason for plaintiff's transfer and firing was defendant's complaints. The letter advising plaintiff of his removal as county supervisor was prepared by OIG to be sent over Chambers' signature.

Incorporated into this issue is the additional question of whether the trial court improperly considered the results of the OIG investigation, or whether this was hearsay which should not have been considered. Plaintiff argues that summary judgment should be based on facts which would be admissible in evidence. (*Fearon v. Mobil Joliet*

*Refining Corp.* (1984), 131 Ill. App. 3d 1, 8, 475 N.E.2d 549, 555.) Hearsay may not be considered in deciding a motion for summary judgment. (*Zonta v. Village of Bensenville* (1988), 167 Ill. App. 3d 354, 357, 521 N.E.2d 274, 277 (and cases cited therein).) Hearsay is an out-of-court statement offered for the purpose of proving the matters asserted therein. While the OIG report would not have been admitted for the purpose of proving the truth of the findings reported therein, it was admissible to demonstrate the circumstances surrounding plaintiff's termination. (See *Richman Chemical Co. v. Lowenthal* (1958), 16 Ill. App. 2d 568, 575, 149 N.E.2d 351, 355.) The granting of the motion for summary judgment as to count I was proper.

Count II alleges a cause of action for economic duress. Defendant argues on appeal that Illinois does not recognize a cause of action for economic duress. If there is no such cause of action in Illinois, the granting of the summary judgment was correct.

In *Dahl v. Federal Land Bank Association* (1991), 213 Ill. App. 3d 867, 872, 572 N.E.2d 311, 314, the court refused to recognize a new cause of action for duress, stating:

> "As for the third count of the first amended complaint, plaintiffs urge this court to establish a cause of action for duress. As plaintiffs correctly point out, no Illinois court has to date recognized duress as an independent cause of action giving a right to affirmative relief as opposed to defensive relief. Duress has been available to avoid obligations, but not as an independent cause of action for damages. In the 'Introductory Note on Duress and Undue Influence' to sections 174 through 177 of the Restatement (Second) of Contracts, the author of that commentary states:
>
>> 'Since duress and undue influence, unlike deceit, are not generally of themselves actionable torts, the victim of duress or undue influence is usually limited to avoidance and does not have an affirmative action for damages.' (Restatement (Second) of Contracts, 'Introductory Note on Duress & Undue Influence,' at 474 (1981).)
>
> We decline to create a new cause of action urged upon us by plaintiffs."

Courts in other States have agreed with this conclusion. (See, *e.g.*, *Bank Leumi Trust Co. v. D'Evori International, Inc.* (1990), 163 A.D.2d 26, 30-31, 558 N.Y.S.2d 909, 914.) More recently, however, in *Butitta v. First Mortgage Corp.* (1991), 218 Ill. App. 3d 12, 578 N.E.2d 116, the dismissal of a complaint involving a count for damages due to economic duress was discussed. *Butitta* did not conclude

that Illinois does not recognize a cause of action for economic duress; instead, the court found the complaint failed to demonstrate duress and thus failed to state a cause of action for economic duress. *Butitta*, 218 Ill. App. 3d at 17-18, 578 N.E.2d at 120-21.

Generally, economic duress is not treated as a tort. It may be a defense to the enforcement of a contract or the basis for restitution or rescission of a contract. (See *First National Bank v. Sanchez* (1991), 112 N.M. 317, 320, 815 P.2d 613, 616.) The *First National Bank* court stated:

> "There are circumstances in which a claim of economic duress has been analyzed as a tort, *see Terrel*, 86 N.M. at 422, 524 P.2d at 1040, although, in its traditional sense, duress is not in and of itself a recognized tort. *See* D. Dobbs, *Handbook on the Law of Remedies* §10.2, at 657 (1973). Under tort analysis the victim of duress may recover 'all damages suffered which were proximately caused by the economic compulsion.' *Terrel*, 86 N.M. at 423, 524 P.2d at 1039. It should be remembered, however, that the doctrine of duress is in essence a remedy that is restitutionary in nature. *See* D. Dobbs, *Handbook on the Law of Remedies* §10.2 (1973); *see also* Dawson, *Economic Duress—an Essay in Perspective*, 45 Mich. L. Rev. 253, 282 (1947) ('The historical connection between duress and the law of crime and tort has obscured the main function of duress doctrines, the prevention of unjust enrichment[ ]')." *First National Bank*, 112 N.M. at 320-21, 815 P.2d at 616-17.

Economic duress may even be used to "defend" against the other party's defenses, such as release, accord and satisfaction, or that an action for breach of a contract is waived. (See generally *Rose v. Vulcan Materials Co.* (1973), 282 N.C. 643, 664-66, 194 S.E.2d 521, 535-37; *Fallston Finishing, Inc. v. First Union National Bank* (1985), 76 N.C. App. 347, 361-63, 333 S.E.2d 321, 329-30.) The concept of economic or business compulsion has evolved from common law duress. (See generally *Centric Corp. v. Morrison-Knudsen Co.* (Okla. 1986), 731 P.2d 411, 415; see also *Starks v. Field* (1939), 198 Wash. 593, 598, 89 P.2d 513, 515 (which involved a complaint to avoid a contract based on a theory of business compulsion).) The rationale behind economic duress is to discourage persons in a stronger position, usually economic, from abusing that power by presenting unrealistic sets of alternatives to persons in a weaker, more vulnerable position, *in a bargain situation. (First National Bank*, 112 N.M. at 320, 815 P.2d at 616, quoting *Terrel v. Duke City Lumber Co.* (N.M. Ct. App. 1974), 86 N.M. 405, 422, 524 P.2d 1021, 1038, *aff'd in part, rev'd in part*

(1975), 88 N.M. 299, 540 P.2d 229.) As a result, the court in *Housing Authority v. Hubbell* (Tex. Ct. App. 1959), 325 S.W.2d 880, 902-05, stated duress is a tort, even though it may arise in combination with a breach of contract, and has further stated that economic coercion is a form of duress. See also *State National Bank v. Farah Manufacturing Co.* (Tex. Ct. App. 1984), 678 S.W.2d 661, 683; *King Construction Co. v. W.M. Smith Electric Co.* (Tex. Ct. App. 1961), 350 S.W.2d 940, 944-45.

The elements of economic duress have been stated a number of different ways. In *Troutman v. Facetglas, Inc.* (S.C. Ct. App. 1984), 281 S.C. 598, 602-03, 316 S.E.2d 424, 427, citing 13 S. Williston, Contracts §1617 (W. Jaeger 3d ed. 1970), the elements were described as follows: (1) the coerced party must be the victim of wrongful or unlawful acts or threats; (2) the acts or threats must deprive the victim of unfettered will; (3) as a direct result, the victim must be compelled to enter into a disproportionate exchange, or to give up something for nothing; (4) the payment or exchange must be made solely for the purpose of protecting the victim's business or property; and (5) there must be no other adequate remedy at law for the coerced party. In *Troutman*, the lack of an adequate remedy for breach of contract was neither pleaded nor proved, so the court declined to extend the law of intentional torts to embrace economic duress. The Texas cases state the elements as requiring the following: (1) a threat to do something which the threatening party has no legal right to do; (2) some illegal extraction, fraud or deception; and (3) the restraint is imminent such that free agency is destroyed without a present means of protection from the restraint. (*Herndon v. First National Bank* (Tex. Ct. App. 1991), 802 S.W.2d 396, 399, citing *Simpson v. MBank Dallas, N.A.* (Tex. App. 1987), 724 S.W.2d 102, 109.) Of course, any damages sought to be recovered must have been proximately caused by the economic compulsion. *First National Bank*, 112 N.M. at 321, 815 P.2d at 617.

■ Under the facts of this case, summary judgment on count II is affirmed. Even if a cause of action for economic duress were recognized in Illinois, the facts simply do not fit the elements of the cause of action.

This case does not involve a business relationship between the parties such that defendant is unfairly trying to take advantage of plaintiff through a superior position by making unreasonable demands on plaintiff. The direct business relationship between plaintiff and defendant ceased when plaintiff's debt to defendant was discharged in bankruptcy. Furthermore, any damages which plaintiff suffered could

not have been proximately caused by defendant's actions since plaintiff was transferred and his employment eventually terminated as a result of the OIG investigation.

Next we consider whether the granting of summary judgment *ex parte* and without a hearing requires reversal. Section 2—1005(c) of the Code of Civil Procedure (Code) provides that when a motion for summary judgment is filed, the opposing party may file counteraffidavits "prior to or at the time of the hearing on the motion." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).) Section 2—1005(c) is essentially a reenactment of former section 57 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 57). Following the 1955 revision of section 57 of the Civil Practice Law (see Ill. Rev. Stat. 1955, ch. 110, par. 57), summary judgment practice in Illinois was substantially the same as Federal practice under Federal Rule 56 (Fed. R. Civ. P. 56). Ill. Ann. Stat., ch. 110, par. 2—1005, Joint Committee Comments [1955] at 209, and Historical and Practice Notes, at 211 (Smith-Hurd 1983).

The key question here is whether the use of the word "hearing" requires the court to allow attorneys for the parties to argue the merits of the motion orally. There is no definition of the word "hearing" in the Code. Illinois Supreme Court Rule 184 (134 Ill. 2d R. 184) states:

> "No provision in these rules or in the Civil Practice Law prescribing a period for filing a motion requires that the motion be heard within that period. Either party may call up the motion for disposition before or after the expiration of the filing period."

Black's Law Dictionary defines the word "hearing" as it relates to formal, evidentiary hearings such as those conducted by the legislature or administrative agencies, with no attempt made to define "hearing" as it relates to the consideration of pretrial motions in civil cases. Black's Law Dictionary 649 (5th ed. 1979).

Defendant relies on Federal Rule of Civil Procedure 56 and the cases interpreting the rule to argue that the procedure employed in this case was proper. According to defendant, the trial judge issued the following letter to counsel for the parties:

> "In civil cases motions to strike, to dismiss, and for summary judgment will be taken on briefs without oral arguments unless the court indicates oral argument is desired. Attorneys are requested to furnish courtesy copies of their briefs to the assigned judge.

The motions to strike and to dismiss are to be scheduled as follows: 10 days after the filing of the motion to file brief in support of the motion, 10 days thereafter to file brief in opposition thereto, 7 days thereafter to file any rebuttal material.

The motion for summary judgment is scheduled as follows: the brief in support should be filed with the motion, 14 days after the filing of the motion for the filing of the brief in opposition to the motion.

We ask that you contact the other attorneys of record after you have filed your brief."

Plaintiff does not deny knowledge of this procedure or receipt of the letter.

■ Subject to the rules of the supreme court, circuit courts may make rules regulating their dockets, calendars, and business. (Ill. Rev. Stat. 1989, ch. 110, par. 1—104(b).) A majority of circuit judges may adopt rules governing civil and criminal cases as long as they are consistent with supreme court rules and Illinois statutes and, as far as practicable, uniform throughout the State. (134 Ill. 2d R. 21(a).) The Uniform Rules of Practice for the Sixth Judicial Circuit of Illinois adopted effective June 1, 1983, provide by Rule 2.1(b) that, except for emergency matters, "no motion shall be heard unless previously allotted for hearing on the court's calendar." (6th Jud. Cir. R. 2.1(b), at 5 (eff. June 1, 1983).) Rule 2.1(f) provides "[a] motion for summary judgment shall not be heard until ten (10) days after service of the notice of motion under Supreme Court Rule 11." (6th Jud. Cir. R. 2.1(f), at 5 (eff. June 1, 1983).) And Rule 2.1(j) provides: "The burden of obtaining an allotment for hearing in a civil case is on the party making the motion. If an allotment for hearing is not obtained by the moving party within ninety (90) days from the date it is filed, the court may deem the motion withdrawn and deny the relief requested with, or without, prejudice." (6th Jud. Cir. R. 2.1(j), at 5 (eff. June 1, 1983).) These uniform rules do not prohibit a trial judge from setting specific rules of procedure for specific cases. Although the trial judge here may have used the same procedure in all cases coming before him, his letter to counsel was specific as to this case.

No specific allotment of a hearing date was made with regard to defendant's motion for summary judgment. In this case, a motion to dismiss had been previously considered, and the parties were aware of the procedure. Plaintiff's attorney's letter to defendant's counsel, dated January 8, 1990, makes clear plaintiff knew the procedure the trial judge would follow with respect to motions to dismiss and motions for summary judgment.

Plaintiff does not complain that the judge may not direct how the case proceeds. Instead, the plaintiff argues that the motion for summary judgment should not have been considered in the absence of an allotment for hearing. The letter from the trial judge gave notice that the hearing would automatically be set 14 days after the filing of the motion. We agree with defendant that the word "hearing" is not necessarily restricted to an oral presentation by the parties and may instead refer to the court's consideration of a written presentation by the parties. Here, plaintiff received a copy of the motion for summary judgment on November 26, 1990. It had been filed November 21, 1990. Proof of service indicates it was mailed on November 20, 1990, in conformity with Supreme Court Rule 11. (134 Ill. 2d R. 11.) The trial court granted summary judgment January 3, 1991, some 44 days later. Plaintiff filed his motion to vacate on February 1, 1991, some 72 days later. The plaintiff had ample opportunity to respond to defendant's motion for summary judgment. In addition, plaintiff filed a motion to vacate which incorporated his objections and counteraffidavits. There is nothing in the record which indicates the trial judge did not fully consider defendant's position before denying the motion to vacate the summary judgment. Furthermore, as we have already concluded, there was nothing in the documents supporting plaintiff's motion to vacate the summary judgment which would have precluded the trial court's entry of summary judgment.

For the foregoing reasons, the judgment of the circuit court of Champaign County is affirmed.

Affirmed.

LUND, J., concurs.

JUSTICE COOK, concurring in part and dissenting in part:

I concur in the majority's disposition of count II.

The supreme court has the power to enact rules governing proceedings in the trial court. (134 Ill. 2d R. 1; see also Ill. Rev. Stat. 1989, ch. 110, par. 1—104(a).) A majority of the circuit judges in each circuit may also adopt rules, but those rules must be consistent with the rules of the supreme court and with State statutes. (134 Ill. 2d R. 21(a); see also Ill. Rev. Stat. 1989, ch. 110, par. 1—104(b).) Individual trial judges have inherent power to deal with the cases before them (*Bejda v. SGL Industries, Inc.* (1980), 82 Ill. 2d 322, 329, 412 N.E.2d 464, 467; *Terrill v. St. Louis Southwestern Ry. Co.* (1987), 154 Ill. App. 3d 983, 986, 507 N.E.2d 1282, 1284), but they do not have the

power to make rules of court. If each judge had the power to make his or her own rules, Supreme Court Rule 21(a), which directs that so far as practicable rules be uniform throughout the State, would be violated. (134 Ill. 2d R. 21(a).) An individual trial judge may establish procedures in a particular case which seem very much like rules, but those procedures take the form of orders, with notice to the parties. A trial judge may not simply assume those practicing in his or her courtroom know his "rules." Of course, the parties did have some knowledge of the procedures employed by the trial court in this case.

The trial judge's letter outlining his procedures leaves some unanswered questions. The procedures address the filing of briefs, but not the filing of affidavits. Will extensions of time be granted routinely, or only upon good cause shown? If the trial judge chooses not to allow oral argument will he so notify the parties, and will the nonmovant then have some additional time to file affidavits? If the trial judge chooses to have oral argument, the nonmovant should have until the time of the hearing to file counteraffidavits, by virtue of section 2—1005(c) of the Code, notwithstanding the trial judge's 14-day requirement for briefs. It is no answer that those regularly practicing before the trial judge know how these cases are handled.

Court rules must be reasonable, and less formal procedures in individual cases must be reasonable as well. (See *People v. Adams* (1983), 116 Ill. App. 3d 315, 320, 451 N.E.2d 1351, 1355.) Summary judgments should be granted only where there has been a fair and full opportunity to respond. (*Midwest Bank & Trust Co. v. Village of Lakewood* (1983), 113 Ill. App. 3d 962, 972, 447 N.E.2d 1358, 1364.) The 14 days allowed in this case for plaintiff to file a brief, and apparently counter-affidavits, was not a sufficient length of time. The time set for responding should approximate the reasonable time necessary for responding, and should not be justified by the possibility that the time may be extended. A procedure which makes it likely that parties will not respond is not a good procedure. (Compare *Cannon v. Dini* (1992), 226 Ill. App. 3d 82, 89 (reversing a Rule 103(b) (134 Ill. 2d R. 103(b)) dismissal), and dissenting opinion of Justice DiVito.) On their face the trial court's procedures here favor movants, who have no deadline for the preparation of their briefs and affidavits.

Plaintiff should have sought an extension of time to file a brief and counteraffidavits in this case, preferably within the 14 days, but in any case as soon as possible. Still, the shortness of the time period chosen by the trial court greatly increased the potential for attorney error, especially in this case where the mail time to plaintiff's attor-

ney's office was apparently six days. Attorneys cannot be expected to act immediately on every piece of mail which comes into their offices.

I am not convinced any problem with the 14-day period was cured by the fact that the trial court did not rule on the motion for summary judgment until 44 days after it was filed. After the 14 days had passed, plaintiff may have reasoned it was too late to request an extension of time (but see 134 Ill. 2d R. 183), and that the appropriate remedy was a motion to vacate. When the motion for summary judgment was not immediately ruled upon, plaintiff could have reasoned the court had decided to set it for hearing. Nor am I convinced that any problems with this procedure were resolved by the fact that plaintiff filed a motion to vacate, together with a brief and supporting affidavits. The trial court's order simply says, "Plaintiff's Motion to Vacate Summary Judgment is hereby denied." There is no indication the trial court reconsidered its ruling upon the motion for summary judgment in light of the brief and affidavits.

While summary judgment is a useful procedure, "it is a drastic means of disposing of litigation." (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871.) Summary judgments should not be granted by default, but only where justified by the papers before the court. Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c) ("The judgment sought shall be rendered without delay if the [papers] *** show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"); see *Hibernia National Bank v. Administration Central Sociedad Anonima* (5th Cir. 1985), 776 F.2d 1277, 1279 (summary judgment improper even if local rule violated by failure to respond).

Counsel have not cited any prior Illinois case which approves the granting of a motion for summary judgment without allowing the parties some opportunity for oral argument. The Code contemplates at least a hearing on a motion for summary judgment. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c) ("The opposite party may prior to or at the time of *the hearing* on the motion file counteraffidavits" (emphasis added)).) The rules of the sixth circuit also contemplate a hearing. (6th Jud. Cir. R. 2.1(f), at 5 (eff. June 1, 1983) (a "motion for summary judgment shall not be *heard* until ten (10) days after service of the notice of motion under Supreme Court Rule 11" (emphasis added)).) We should be careful about approving a procedure so at odds with general practice. Supreme Court Rule 352(a) allows appellate courts to dispose of any case without oral argument as provided therein. (134 Ill. 2d R. 352(a).) No similar rule allows a trial court to dispense with oral argument as a matter of routine. In the Federal

courts, oral argument is not required on a motion for summary judgment, but there must be an adequate opportunity to respond to the movant's arguments. See *Lujan v. National Wildlife Federation* (1990), 497 U.S. 871, 910, 111 L. Ed. 2d 695, 730, 110 S. Ct. 3177, 3200 (Blackmun, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.).

Affidavits filed in the present case indicate that defendant Central Production Credit Association, and plaintiff's employer, FmHA, work together in many areas; that plaintiff discharged a debt to defendant in bankruptcy; that Donald Cochran, defendant's president for the area in question, told an FmHA official that because of plaintiff "they had taken a hit for $500,000"; that defendant had not had communication with FmHA's Lawrenceville office since that time; that nothing could be done to resolve those differences; and Cochran's "only suggestion was for [plaintiff] to be moved." Robert Chambers, FmHA's director for the State of Illinois, testified that defendant's complaints about plaintiff were not the reason for plaintiff's transfer or termination; the reason was an ongoing OIG investigation. The details disclosed by the OIG investigation (which as hearsay should not be considered in deciding this motion) might furnish strong support for defendant's position that its comments were not the cause of plaintiff's transfer, but a court cannot weigh evidence in deciding a motion for summary judgment; if an issue of material fact exists the motion must be denied. (*Gatlin v. Ruder* (1990), 137 Ill. 2d 284, 292-94, 560 N.E.2d 586, 589-90.) There is an exception where what is contained in the papers on file would constitute all of the evidence before the court at trial; in that event, if the evidence would be insufficient to go to the jury, the court should treat the motion as it would one for directed verdict. (*Fooden v. Board of Governors of State Colleges & Universities* (1971), 48 Ill. 2d 580, 587, 272 N.E.2d 497, 500; *Pyne*, 129 Ill. 2d at 358, 543 N.E.2d at 1308.) The *ex parte* proceedings in this case do not justify an assumption that the exception applies here.

I would reverse the summary judgment on count I, and remand for the trial court to conduct a hearing on the motion at which oral argument would be allowed.