**Deborah LEWIS–KEARNS, Plaintiff,**

v.

**MAYFLOWER TRANSIT, INC., an Indiana Corporation, Glen Ellyn Storage Corp., an Illinois Corporation, Union Van Lines, Inc., an Illinois Corp., and Olsen Bros., Inc., an Illinois Corporation, Defendants.**

No. 94 C 5289.

United States District Court, N.D. Illinois, Eastern Division.

July 11, 1996.

Patricia Anne Felch, Law Offices of Patricia A. Felch, Chicago, IL, Terence Edward Flynn, Law Office of Terence E. Flynn, Chicago, IL, for plaintiff Deborah Lewis–Kearns.

Brian William Bell, William Blake Weiler, Swanson, Martin & Bell, Chicago, IL, for defendant Mayflower Transit Inc.

John J. Mangan, Scott M. Hardek, Rooks, Pitts & Poust, Wheaton, IL, Manuel Sanchez, Lela Darlene Johnson, Therese J. Stanisha, Sanchez & Daniels, Chicago, IL, for defendant Glen Ellyn Storage Corp.

Julie Badel, David Brian Montgomery, McDermott, Will & Emery, Chicago, IL, Manuel Sanchez, Lela Darlene Johnson, Sanchez & Daniels, Chicago, IL, for defendants Union Van Lines, Inc., Olsen Bros., Inc.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiff Deborah Lewis–Kearns has filed an eight count complaint against defendant Mayflower Transit, Inc. ("Mayflower"), and its agents Glen Ellyn Storage Corp. ("Glen Ellyn"), Union Van Lines, Inc. ("Union"), and Olsen Bros., Inc. ("Olsen"). Counts I through V allege racial discrimination under 42 U.S.C. § 1981, and Counts VI through VIII allege interference with contracts and interference with prospective business relationships. Jurisdiction is predicated upon 28 U.S.C. § 1331 and 1343(a)(4) and 28 U.S.C. § 1367.

The defendants have moved for summary judgment on all counts. For the reasons stated below, the motion is granted in part and denied in part.

## FACTS

Defendant Mayflower is a moving and storage company engaged in interstate commerce. Defendants Glen Ellyn, Union, and Olsen are independently owned Mayflower agents.

The relationship between Mayflower and its agents is not entirely clear from the record, but it appears that Mayflower provides name recognition, advertising and marketing consultation, and the agency network to coordinate interstate transportation of household goods. The agents provide the actual moving and storage services for their clients.

In July 1993, plaintiff met Mark Harris, a vice president of Mayflower, at a wedding of a mutual friend. Plaintiff attended a meeting with Harris on August 17, and Mayflower subsequently expressed interest in appointing plaintiff as a Mayflower agent. Mayflower's interest in plaintiff stemmed from her status as an African American female, to enable Mayflower to penetrate markets set aside for minority-owned businesses.

Plaintiff had no prior education or experience in the moving and storage business, and she had no formal training in accounting or finance. Further, she did not have the financial resources necessary to establish a typical full-service Mayflower agency, which would require funds for payroll, trucks, and warehouse facilities.

Because of plaintiff's lack of experience and financing, Mayflower explored the possibility of making a special arrangement for her. The new concept was called a "sales agency" because plaintiff would limit her activities to booking business. Other Mayflower agents such as Glen Ellyn, Union, and Olsen would provide the actual packing and moving. The sales agency would require less capital investment than a full-service agency. The amount of start-up investment necessary, however, and the extent to which Mayflower would assist in financing the sales agency, are in dispute.

Plaintiff alleges that she entered into two oral contracts with Mayflower: the first was to establish a sales agency, and the second was to recruit minority employees for Mayflower. Plaintiff alleges Mayflower breached

both contracts as a result of racial hostility expressed by defendants Glen Ellyn, Union, and Olsen.

### Sales Agency Contract

During September and October 1993, plaintiff alleges that she obtained office space for her agency, hired an accountant, and studied the moving and storage business. On October 1, 1993, plaintiff attended separate meetings with defendants Glen Ellyn and Union to arrange for them to provide moving and storage services for her sales agency. Plaintiff's financial adviser, Andrew Sawyer, was present at the meeting with Glen Ellyn, and Mayflower's Harris was present at both meetings.

Plaintiff alleges that Larry Smith of Glen Ellyn objected to doing business with her because she was black, and threatened to use Glen Ellyn's clout to prevent her appointment as a Mayflower agent. According to plaintiff, Smith said, "I have a problem with having you stuffed down my throat by the corporation." Plaintiff alleges that Smith said that he did not believe in quota systems based on race, and that he did not want to help a black-owned agency to become successful.

Others present at the meeting give differing accounts. Sawyer, plaintiff's financial adviser, confirms that Smith said he was not interested in working with a minority-owned company, and that he did not believe in affirmative action. Harris admits that Smith was "vehemently opposed" to the idea of plaintiff's sales agency before the meeting, but contends that this opposition was based on concerns with increased competition rather than plaintiff's race. Harris testified that during the meeting Smith said he did not want to be part of a "sham" to get minority business. Smith himself denies that he objected to doing business with minorities. Subsequent to the meeting, however, Smith wrote a letter to the president of Mayflower requesting input prior to the plaintiff's appointment as an agent.

Plaintiff also met with Union on October 1, 1993. She testified that Keith Svec of Union said he objected to working with plaintiff because she was a black female, and that

Union would "fight" against the establishment of her agency. Sawyer was not present at that meeting, and both Harris and Svec deny plaintiff's account of the meeting.

Finally, plaintiff met with Richard Olsen on November 4, 1993, who represented Olsen, another Mayflower agent. Unlike Glen Ellyn and Union, Olsen did offer plaintiff a "Sales Agreement" to handle moving and storage services for plaintiff's clients. According to plaintiff, however, the terms of the agreement were extremely unfavorable. Plaintiff perceived the proposed agreement as an attempt to prevent her from doing business because she was black. Plaintiff did not testify, however, that Olsen made any racially motivated comments during or subsequent to the meeting. Further, plaintiff did not attempt to negotiate the terms with Olsen after receiving the initial proposal, even though Olsen called her to follow up on the status of the agreement. Plaintiff did complain about the proposal to Mayflower, and Thomas Ahern of Mayflower subsequently called Olsen to say the agreement was "too restrictive."

On March 4, 1994, plaintiff wrote a letter to Mayflower stating grievances with the entire process, and requesting to either "proceed forward or to bring some closure to this situation." Soon after, Mayflower decided to cease negotiations with Kearns.

### Recruiting Contract

Plaintiff also alleges that she had a "recruiting contract" with Mayflower which required her to screen and present minority females to be hired by Mayflower as sales representatives. The agreement was for Mayflower to submit a "job order" when it wanted a candidate. Plaintiff admits, however, that Mayflower never sent such a job order. In addition, the parties never agreed whether plaintiff would be paid on a contingency basis or by a retainer. According to plaintiff, the method of compensation was to be determined when Mayflower sent a job order.

Nonetheless, plaintiff presented two applicants for interviews by Mayflower. Mayflower did not hire either candidate, and

plaintiff alleges that Mayflower breached the so-called contract by not paying for her services.

### Summary Judgment Standard

■ In a motion for summary judgment, the moving party is entitled to judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The movant has the initial burden to establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the movant has met this burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(c).

■ The court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In addition, "this standard is applied with added vigor in employment discrimination cases, where intent and credibility are crucial issues." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993). Summary judgment will not be defeated, however, simply because issues of motive and intent are involved. *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 148 (7th Cir.1994). If plaintiff fails to offer evidence to establish motive or intent, summary judgment is appropriate. *Id.*

### Discussion

#### I. Counts I through V—42 U.S.C. § 1981 Claims

Plaintiff alleges that Mayflower refused to appoint her as a sales agent because of race-based pressure exerted by Glen Ellyn, Union, and Olsen. Count I seeks damages against Mayflower for refusing to appoint her because of her race. Count II seeks damages against Mayflower vicariously for the acts of its agents. Counts III through V seek damages against the agency defendants for interfering with her right to contract with Mayflower.

#### A. Direct Evidence Approach ·

■ Plaintiff may prove her § 1981 race discrimination claim in one of two ways. The first is through direct evidence of discriminatory intent. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985). Under the direct evidence test, the evidence, if true, must prove the particular fact in question without reliance upon inference or presumption. *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989). Further, the evidence must "not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Id.* For purposes of summary judgment, the evidence only must create a genuine issue of fact as to discriminatory intent.

■ Plaintiff has produced some direct evidence of discriminatory intent on the part of Glen Ellyn and Union. She testified in her deposition that representatives of both objected to working with her because of her race, and threatened to use their influence to prevent Mayflower from appointing her as a sales agent. Plaintiff's financial adviser confirmed that Smith of Glen Ellyn said he was opposed to a minority sales agency. Plaintiff's account of the meeting with Union is uncorroborated. Although defendants deny objecting to plaintiff's sales agency because of her race, a genuine issue of fact exists regarding what Glen Ellyn and Union officials said, and whether these comments were motivated by plaintiff's race or by other legitimate considerations.

Plaintiff does not allege that Mayflower expressed any racial motive in its decision. She has provided, however, direct evidence that Glen Ellyn and Union influenced Mayflower's decision. Mayflower was fully aware of the agencies' alleged objections to plaintiff's sales agency. Harris of Mayflower was present at the meetings with Glen Ellyn and Union, and he testified that he reported the proceedings to other Mayflower officials. In fact, Harris admitted that even before the meeting he knew Glen Ellyn opposed the sales agency.

In addition, according to Mayflower's then general counsel Robert Irvin, Smith was rude to plaintiff during a regional meeting on October 20, 1993. Irvin testified that Smith demanded to know, "Why are these people (plaintiff) here? They're not even agents. They shouldn't even be here." Finally, Smith's letter to Mayflower, referring to plaintiff, requests there to be "some discussion with Chicagoland agents prior to any agency appointment."

Mayflower officials testified that Glen Ellyn was an influential agent. Harris stated that Glen Ellyn was one of Mayflower's top five volume agents nationwide, and has "some influence" with Mayflower as a result. Further, Glen Ellyn's agency contract with Mayflower was terminable with 30 days notice. Harris noted that "there has always been a prevailing threat" that Glen Ellyn would leave Mayflower, although Harris said Glen Ellyn did not threaten to leave if plaintiff was appointed.

Mayflower had a strong interest in maintaining good relations with such an important agent as Glen Ellyn who otherwise could change affiliations. Moreover, although Mayflower officials testified that Union was not as lucrative an agent as Glen Ellyn, Union's opposition to working with plaintiff, combined with Glen Ellyn's objections, could have influenced Mayflower's decision.

Given the direct evidence of Glen Ellyn's and Union's racial hostility, and the existence of a genuine issue as to whether such hostility influenced Mayflower, summary judgement must be denied based on the direct evidence test.

The court notes, however, that there is no direct evidence that defendant Olsen was motivated by race in offering plaintiff a sales agreement with unfavorable terms. Thus, Olsen is entitled to summary judgment unless plaintiff can establish a *prima facie* case under the indirect, burden shifting approach.

### B. Indirect, Burden–Shifting Approach

■ Even if plaintiff's direct evidence is insufficient to withstand summary judgment, she has met her *prima facie* burden of showing discrimination under the indirect, bur-

den-shifting method as set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and applied to Section 1981 cases in *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989). The burden is not onerous. *McDonnell,* 411 U.S. at 792, 93 S.Ct. at 1817. To establish a *prima facie* case, plaintiff must show that: (1) she applied for an available position; (2) she was qualified for the position; (3) she was rejected; and (4) after she was rejected, defendant either continued to seek applicants or filled the position with a white employee. *Patterson,* 491 U.S. at 186, 187, 109 S.Ct. at 2377, 2378.

■ Once plaintiff establishes a *prima facie* case, the defendant may offer legitimate nondiscriminatory explanations for those acts. Plaintiff then must show that defendant's stated justifications are pretext. For summary judgment purposes, plaintiff must only "produce evidence from which a rational fact-finder could infer that the company lied" about the reasons for its decision. *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 (7th Cir.1994).

■ All defendants claim that plaintiff has failed to establish the second and fourth elements of the *prima facie* case. They assert that plaintiff was not financially qualified to create a sales agency. Although a sales agency would require less capital investment than a full-service agency, defendants claim that plaintiff was unable to raise even the lesser amount of funds necessary for rent, payroll, telephone, and other ordinary business expenses. Sawyer, plaintiff's financial adviser, admitted that Thomas Ahern of Mayflower said Mayflower would not provide the $300,000 necessary to fund the agency's first year of operation.

The financial qualifications required to begin a sales agency targeted to minority set-aside business, however, were not clear. Plaintiff testified that Ahern initially told her, sometime in September 1993, that her lack of financing was not a problem. Ahern admitted that he said Mayflower would assist the agency in obtaining financing from a bank and provide other types of financial, training, and administrative assistance. Fur-

ther, Ahern did not tell Sawyer that Mayflower would not provide the start-up funding until late October 1993, well after plaintiff's meetings with Glen Ellyn and Union.

Thus, because there is an issue of fact as to the amount of financing that Mayflower was originally willing to provide before the alleged racial animus was expressed by Glen Ellyn and Union, plaintiff satisfies the second element of the *prima facie* case for purposes of summary judgment.[1]

■ Defendants also argue that plaintiff cannot establish the fourth element of the *prima facie* case, that Mayflower filled the position with a white employee. Plaintiff counters with evidence that other non-minority agents have been appointed. Mayflower's purpose in considering plaintiff as a sales agent, however, was solely to target minority set-aside business. Thus, it would be impossible to show that Mayflower filled the position with a non-minority because only a minority could meet the qualifications for the position.

The U.S. Supreme Court has held that the fourth element is "not a proper element of the McDonnell Douglas prima facie case" when it "lacks probative value." *O'Connor v. Consolidated Coin Caterers Corporation*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996). Following *O'Connor*, the Seventh Circuit held, "that one's replacement is of another race may help to raise an inference of discrimination, but it is neither a sufficient or necessary condition." *Carson v. Bethlehem Steel Corporation*, 82 F.3d 157, 159 (7th Cir.1996). In the case at hand, failure to satisfy the fourth element does not preclude the possibility that Mayflower refused to appoint plaintiff because of her race. It is irrelevant whether Mayflower attempted to appoint a white as a "minority" sales agent. Thus, the fourth element of the McDonnell Douglas test is not applicable, and plaintiff has satisfied the first step of the burden shifting approach.

■ Mayflower has countered by offering legitimate, nondiscriminatory reasons for ceasing negotiations with Kearns. According to Mayflower, Kearns was financially unqualified, she failed to create a viable business plan after months of meetings and despite numerous requests, she never completed the standard agency application, and plaintiff's March 4, 1994 letter was somehow offensive.

Plaintiff must now show that defendants' stated reasons were pretext. The issue of her financial qualifications was discussed above, and there is a genuine issue whether plaintiff's lack of financing was prohibitive. Regarding the business plan, plaintiff states that Mayflower failed to provide her with a list of target accounts necessary to create such a plan. Ahern admits that he told Harris not to give plaintiff this information. Although Ahern said he withheld the information because it was "premature," the issue of whether the list was essential to create a business plan is contested. Thus, for purposes of summary judgment, plaintiff has met her burden of showing that Mayflower's reasons for not appointing her were pretext.

Plaintiff has established a genuine issue of material fact as to whether race was a factor in Mayflower's decision not to appoint her as a sales agent under both the direct evidence test and the indirect, burden-shifting approach. As a result, summary judgment on Count I is denied.

■ Count II requires the court to consider Mayflower's vicarious liability under 42 U.S.C. § 1981 for the acts of its agents. Vicarious Section 1981 liability exists under the traditional elements of respondeat superior. *Malone v. Schenk*, 638 F.Supp. 423, 425 (C.D.Ill.1985). *General Building Contractors Association, Inc. v. Pennsylvania*, 458 U.S. 375, 404, 102 S.Ct. 3141, 3157, 73 L.Ed.2d 835 (1982) (O'Connor, J., concurring). Thus, the court would ordinarily have

---

1. Plaintiff also argues that Mayflower provided financing for Gary Quintalino, a white male, to establish a sales agency in a market outside of Chicago, demonstrating that a lack of financing was not prohibitive. However, Quintalino's loan was secured by a first mortgage on his home, and Quintalino had been a long-term Mayflower sales representative at the time. Thus, Quintalino's situation was not similar plaintiff's. The court is not persuaded by plaintiff's argument that Mayflower's treatment of Quintalino shows that no financial qualifications are necessary to establish a sales agency.

to determine both whether the agents violated section 1981 and whether a principal-agent relationship existed between Mayflower and its "agents." *Malone*, 638 F.Supp. at 425. Mayflower, however, has not argued that it is not in a principal-agent relationship with Glen Ellyn and Union, leaving the agents' liability as the only remaining inquiry.

■ Counts III and IV seek damages under section 1981 against defendants Glen Ellyn and Union for interfering with Kearns' right to contract with Mayflower. Defendants argue that even if plaintiff's allegations are true, they cannot be liable under section 1981 for Mayflower's failure to appoint plaintiff as a sales agent. Section 1981, however, "proscribes not only discrimination by the contracting party . . . but also discriminatory interference by a third party with the exercise of the right to make contracts." *Vakharia v. Swedish Covenant Hospital*, 765 F.Supp. 461, 471 (N.D.Ill.1991). "As long as the interference prevents or impedes the formation of the contract, it is covered by section 1981." *Id.* As discussed above, there is a genuine issue of fact as to whether Glen Ellyn and Union actually influenced Mayflower's decision. Accordingly, summary judgment is denied with respect to Counts II, III and IV.

■ As noted above, there is no direct evidence that defendant Olsen interfered with plaintiff's contract with Mayflower because of plaintiff's race. Plaintiff's section 1981 claim against Olsen also fails under the indirect, burden shifting approach. Plaintiff offers no evidence that Olsen's offer was pretext for racial discrimination. The record simply reflects that Olsen delivered a proposal to plaintiff, which was not accepted. Thereafter, Olsen telephoned plaintiff to follow up, but the negotiations ceased because there were no further discussions between the parties. The fact that Ahern of Mayflower telephoned Olsen to say the proposal was "too restrictive" does not support plaintiff's contention that Olsen was racially motivated or that Olsen interfered with plaintiff's contractual rights with Mayflower. Thus, Olsen's motion for summary judgment on count V is granted.

## II. Counts VI–VIII—Interference with Contract and Prospective Business Relationships

In counts VI–VIII, plaintiff alleges defendants Glen Ellyn, Union, and Olsen tortiously interfered with her contracts and perspective business relationship with Mayflower. The claims involve both the alleged sales agency contract and the alleged recruiting contract.

### A. Interference with Contract

■ The elements of this tort are: (1) the existence of a valid contract; (2) defendant's knowledge of the contract; (3) intentional and malicious inducement of the breach; (4) a subsequent breach by a third person due to defendant's wrongful conduct; and (5) damages resulting from the breach. *Lawless v. Central Production Credit Association*, 228 Ill.App.3d 500, 509, 170 Ill.Dec. 530, 592 N.E.2d 1210 (Ill.App.Ct.1992).

#### 1. Interference with Plaintiff's Recruiting Contract

■ For a contract to be created, the plaintiff must show an offer, acceptance, and consideration. Further, the terms of the contract must be reasonably certain. *Caporale v. Mar Les, Inc.*, 656 F.2d 242, 245 (7th Cir.1981). Finally, an oral agreement must meet the same requirements as a written contract to be valid, including the requirements that the subject matter be sufficiently identified. *Ashline v. Verble*, 55 Ill.App.3d 282, 284, 12 Ill.Dec. 809, 370 N.E.2d 613 (Ill.App.Ct.1977).

■ In the instant case, plaintiff cannot establish the consideration she was to receive for the alleged recruiting contract. She admits that she never came to an agreement whether she would be paid on a contingency or retainer basis. The contingency option would mean that plaintiff would not be paid anything if Mayflower did not actually hire the candidates she recommended. Although plaintiff alleges she partially performed the contract by presenting two candidates, the court has no way to determine which measure of compensation is appropriate. Because material terms are not ascertainable,

the court concludes that plaintiff fails to establish the first element of the existence of a valid contract.

Moreover, even if there was a valid contract, plaintiff did not provide evidence that the defendants Glen Ellyn, Union, and Olsen were aware of the recruiting contract. Plaintiff's negotiations with Mayflower's agents involved the sales agency and had nothing to do with any alleged recruiting contract.

Further, even if the court could find a genuine issue as to the above elements, there are no facts to establish that Mayflower breached the alleged contract. As discussed above, one of the payment options was a contingent fee. Plaintiff admits that her candidates were not hired. Thus, Mayflower did not breach the agreement by not paying for plaintiff's services.

### 2. Interference with Plaintiff's Sales Agency Contract

■ Plaintiff also did not have a valid sales agency contract with Mayflower. Even if plaintiff accepted Mayflower's alleged offer of a sales agency contract by beginning to perform certain obligations such as hiring an accountant and obtaining office space, few, if any, material terms were actually agreed upon. There was no agreement as to the obligations of the parties or the consideration involved.

Despite months of negotiations, plaintiff never became more than a prospective sales agent. In fact, the entire gravamen of plaintiff's complaint is that Mayflower refused to enter into an agency contract with her because of her race. Thus, it is clear that plaintiff did not have a valid sales agency contract with Mayflower because a final agreement was never reached.

Further, Mayflower could not have breached a contract it never entered. Finally, there was no contract for the agency defendants to have induced a breach. Thus, plaintiff has failed to establish the elements of interference with contracts regarding her sales agency negotiations with Mayflower.

### B. Interference with Prospective Business Relationships

■ The elements of interference with prospective business relationships are: (1) plaintiff must have a reasonable expectation of entering into a valid business relationship; (2) defendant must have knowledge of the plaintiff's expectancy; (3) defendant must intentionally interfere with the expectancy and prevent it from ripening into a valid business relationship; and (4) plaintiff suffers damages resulting from such interference. *Schuler v. Abbott Laboratories,* 265 Ill.App.3d 991, 994, 203 Ill.Dec. 105, 639 N.E.2d 144 (Ill.App. Ct.1993). Further, the defendant's alleged action must be directed towards the party with whom the plaintiff expects to do business. *Id.*

### 1. Interference with Plaintiff's Recruiting Expectancy

■ Plaintiff may have had a reasonable expectation of entering into a recruiting contract with Mayflower. However, as discussed above, neither Glen Ellyn, Union, nor Olsen was aware of this expectancy, and there is no evidence they interfered with it.

### 2. Interference with Plaintiff's Sales Agency Expectancy

■ Defendants do not contest that plaintiff had a reasonable expectation of becoming a sales agent for Mayflower. In addition, defendants were fully aware that plaintiff expected to enter into such relationship.

Further, as discussed in relation to the section 1981 claims, there is a genuine issue as to whether defendants Glen Ellyn and Union intentionally interfered with the relationship. Plaintiff alleges that Glen Ellyn and Union vowed to fight against her appointment as an agent. Glen Ellyn and Union argue, however, that even if Kearns' assertions are true, their alleged acts did not influence Mayflower's decision to cease negotiations with plaintiff. Nonetheless, plaintiff has established a genuine issue whether Mayflower's stated reasons were pretext, and that Mayflower was influenced by pressure from its agents.

Plaintiff has not met her burden, however, with respect to defendant Olsen. Plaintiff has no evidence that Mayflower's decision was influenced by the fact that Olsen offered her a contract with unfavorable terms. Further, unlike with Glen Ellyn and Union who allegedly vowed to fight against her appointment as a Mayflower agent, Olsen's acts were not directed at Mayflower.

*Conclusion*

For the reasons set forth above, the court denies the defendants' motions to dismiss Counts I–IV of the plaintiff's third amended complaint. The court grants defendant's motion to dismiss Counts V and VIII. With respect to Counts VI and VII, the court grants defendants' motion related to the claims for tortious interference contract and interference with the plaintiff's prospective recruiting relationship, but denies summary judgment related to interference with the plaintiff's prospective agency relationship.